## ANNE LANCASTER HUBBARD

### V.

## COMMONWEALTH OF VIRGINIA

Record No. 910673

January 10, 1992

Present: Carrico, C.J., Compton, Stephenson, Whiting, and Lacy, JJ., Poff, Senior
Justice, and Cochran, Retired Justice

2

*Henry M. Massie, Jr.; Robert G. Cabell, Jr. (McGuire, Woods, Battle & Boothe*, on brief), for appellant.
*Leah A. Darron, Assistant Attorney General (Mary Sue Terry, Attorney General*, on brief), for appellee.

CHIEF JUSTICE CARRICO delivered the opinion of the Court.

Following a two-car collision in which two persons were killed, a jury in the Circuit Court of Henrico County convicted Anne Lancaster Hubbard of two offenses of involuntary manslaughter and fixed her punishment at twelve months in jail for each offense. The trial court approved the convictions but suspended the jail

sentences on condition that Hubbard perform 500 hours of community service, refrain from operating an automobile for 3 years, and remain of good behavior for 10 years.

In a petition for appeal filed with the the Court of Appeals, Hubbard presented four questions:

A. Did the [trial] court err in excluding the evidence of the alcohol impairment, the erratic driving, and the emotional upset of the driver of the [other vehicle?]

B. Did the [trial] court err in permitting reconstructed opinion evidence of speed in a criminal case[?]

C. [Was] the reconstructed opinion evidence of speed presented in this case . . . of the type that was helpful to the jury[?]

D. [Was] the jury . . . properly instructed on manslaughter for purposes of deciding this case[?]

By order, the Court of Appeals refused Hubbard an appeal with respect to Question A, relating to the actions of the driver of the other vehicle, and Question D, relating to instructions. The Court awarded Hubbard an appeal limited to Questions B and C, relating to the reconstructed opinion evidence of speed.

In a published opinion, the Court of Appeals held that the trial court did not err in admitting the reconstructed opinion evidence of speed and affirmed Hubbard's convictions. *Hubbard* v. *Commonwealth*, 12 Va. App. 250, 403 S.E.2d 708 (1991). Then, on her petition to this Court, we awarded Hubbard an appeal to review all four of the issues outlined above.

The accident occurred on River Road in western Henrico County. River Road is a two-lane highway running generally east and west, with a posted speed limit of 45 m.p.h.

On the evening of March 18, 1989, Anne Hubbard and a friend, Mary Veeneman Hamilton, both teenagers, attended a party at the home of a schoolmate off River Road west of the accident scene. Neither Hubbard nor Hamilton had anything alcoholic to drink.[1] Leaving the party about midnight, they pro-

---

[1] A test made of Hubbard's blood after the accident was negative for alcohol and drugs.

ceeded eastwardly on River Road, with Hubbard driving her 1970 Buick Electra convertible.

David Cox, who previously had dated Hubbard, was also a guest at the party. Driving a red Volkswagen, he overtook Hubbard and Hamilton on River Road. When Cox drove closely behind Hubbard, she "tapped her brakes," and he proceeded to pass her over a solid double yellow line. As he was passing, she accelerated, almost causing him to collide with an oncoming vehicle. She then "tailgated" Cox as he attained speeds of 65 to 70 m.p.h.

Cox slowed to 55 m.p.h. as he passed through a series of curves in a construction area. After leaving the construction zone, he accelerated and proceeded down a hill. He began to pull away from Hubbard, but she also accelerated as she followed him down the hill. She was driving so fast that Hamilton was "hanging onto the [passenger's] door with both hands." Hubbard asked Hamilton if she were scared, and Hamilton replied affirmatively. After this exchange, although Hubbard was still "going fast," Hamilton felt no further acceleration and may have even detected "a bit" of braking. By this time, Cox had driven out of sight.

Hubbard reached the bottom of the hill and proceeded up a grade around a curve to the right. As she came out of the curve, her vehicle "started skidding." Hamilton "looked up and . . . saw three sets of headlights and [the Hubbard vehicle] went toward the middle set." That was all Hamilton remembered "besides waking up."

At the same time, John Gregory Senter and his wife, Vicki, were travelling westwardly along River Road. Ms. Senter was driving and, because she was unfamiliar with River Road, she was "going a little bit slower than normal," about 35 to 40 m.p.h. She "turned the rear view mirror up" because she felt a car behind her was following too closely.

As the Senters approached the intersection of River Road and Twin Lakes Lane, they saw "coming toward [them] around [a] curve [the extremely erratic] headlights of a car which . . . was out of control . . . going very, very fast . . . and swerving left and right." When the car crossed into the Senters' lane, Ms. Senter pulled to the right onto the paved surface of Twin Lakes Lane to avoid a collision. The car was swerving to the opposite side of the road as it passed by the Senters' car. John Senter looked over his shoulder and watched the car, observing that "as it apparently crossed into the lane behind [him] it blocked out the headlights"

of the car that had been following them. "After . . . a couple of seconds," the Senters heard a "horrible crash." They did not stop but continued on to their home, where they·called the police.

Mary Hamilton awoke to find herself sitting in Hubbard's wrecked Buick "on the [wrong] side of the road."[2] Hamilton looked "down the hill and . . . noticed another car"; she thought she recognized it as one belonging to Susan Darr, but she "didn't think it could be hers."

The Hubbard vehicle had in fact collided with an automobile operated by Susan Darr. She and a passenger, Catherine A. Davis, were killed in the collision. Both were classmates of Anne Hubbard and Mary Hamilton at a private school in western Henrico County.

The accident was investigated by Officer Ronald James Smith, Sr., a member of the Crash Team of the Henrico County Police Department. Officer Smith approached the accident scene from the west and found Susan Darr's vehicle, a 1980 Honda Accord, partially in the ditch and partially on the pavement of the westbound lane of River Road.[3] He found Hubbard's Buick some 125 feet east of the Honda, also partially in the ditch and partially on the pavement of the westbound lane.

Smith determined that the impact between the two vehicles occurred in the westbound lane, near the center line and approximately 300 feet east of Twin Lakes Lane. Near the point of impact, also in the westbound lane, Smith found a "gouge" mark one foot in length which, he opined, was made when a "sharp piece or object" under the left front of the Honda struck the pavement on impact.[4]

Smith found a "yaw" mark in the eastbound lane extending from the south side of the lane to "the point where the impact occurred." This mark, Smith said, was made by the edge of the right front tire on Hubbard's Buick and meant "the vehicle had lost control coming or going from the right side of the road over to the left side."

---

[2] Anne Hubbard sustained a head injury in the collision. As a result, she suffers from retrograde amnesia and remembers nothing about the collision.

[3] The Honda's speedometer was "locked" at 65 m.p.h. and its tachometer at 3500 r.p.m. The two figures correlate. Officer Smith stated in his accident report that the speed of the Honda at time of impact was between 35 and 40 m.p.h. He testified that he based those figures upon what John Senter had told him about the speed of the Honda.

[4] In his written accident report, Smith attributed the gouge mark to Hubbard's Buick.

As explained in the record, a yaw mark is made by the "lead" tire of a vehicle which is travelling too fast for the angle at which the tire is turned, causing the tire to slide sideways across a road surface while still rotating.[5] Yaw marks are always arc-shaped and characteristically display striations running obliquely across the mark itself.

Smith measured the yaw mark made by the Hubbard vehicle and found it to be 90 feet in length. He then measured a chord across the first 45 feet of that length, next measured to the midpoint of the chord, struck a 90-degree angle, and determined that the middle ordinate was 5 inches. From these figures, Smith ascertained that the radius of the circle in which the Hubbard vehicle had travelled was 607.8 feet.

Several days later, Smith conducted "test skids" at the accident scene and determined that the coefficient of friction of the road surface was .887.[6] Then, using a mathematical formula, speed = the square root of 15 X radius X friction factor, he concluded that the Hubbard vehicle was travelling at an average speed of 89.92 m.p.h. through the first 45 feet of the yaw.

Stephen B. Chewning, president of Traffic Safety Counsultants of Richmond, and Dr. James Charles Wambold, professor of mechanical engineering at Pennsylvania State University, were accepted by the trial court as experts in the field of automobile accident reconstruction, and both testified as witnesses for the Commonwealth. Chewning stated that, using Officer Smith's data and doing additional testing of his own for the "friction level," he determined that the average speed of the Hubbard vehicle through the first 45 feet of the yaw was 89 m.p.h. Dr. Wambold testified that after reviewing Smith's data and making an adjustment for "yaw angle," his calculation of the speed of Hubbard's vehicle through the first 45 feet of the yaw came within 1 m.p.h. of Smith's determination of 89.92 m.p.h.

---

[5] "The theory upon which [an expert bases an opinion on the speed of a vehicle] is that sideslipping, or yawing, occurs when the tendency of the vehicle to go straight ahead (centrifugal force) overcomes the friction holding it to a curved path (traction). Under this theory, if an expert knows the radius of the curved path described by a yawing vehicle and the amount of drag exerted by the road surface, he can calculate the speed at which the centrifugal force of the vehicle overcame the traction of its tires and caused the yawing." *Thorpe* v. *Commonwealth*, 223 Va. 609, 613, 292 S.E.2d 323, 325-26 (1982).

[6] The "test skids" were conducted at the accident scene with police cars travelling approximately 40 m.p.h.

The defense called a father-and-son team of engineers, Sammie F. Lee and David S. Lee of Louisville, Kentucky, who were accepted by the trial court as experts in the field of automobile accident reconstruction. The Lees agreed that the speed of motor vehicles can be determined from yaw marks, but they disagreed with the opinions given by the Commonwealth's experts with respect to Hubbard's speed.

Sammie Lee cited a professional journal that noted numerous examples of miscalculations resulting from use of the theory by unqualified persons. He stressed the need to recreate the exact pavement conditions in testing to determine the coefficient of friction as well as the necessity of adjusting the results obtained from skid tests made at slow speeds to reflect the same conditions present in high-speed yaws. He noted the effect that the application of brakes and the use of different types of tires can have on the result in a given case. He said that, in his opinion, the Hubbard vehicle "was not going anything like [89 miles an hour]" but in "the range of 65 to 70."

In his testimony, David Lee said it was necessary to make certain adjustments to the data the Commonwealth's experts had used in their speed computations. He criticized Officer Smith's use of a 45-foot chord and a 5-inch middle ordinate, maintaining that each measurement should have been longer, with a resulting lower computation of speed.

Lee was also critical of the figure Chewning used for the coefficient of friction, saying the figure did not take into account the use of low-speed skid tests, the absence of lateral forces, and the possible wetness of the road surface. He complained of the failure of the Commonwealth's experts to make allowances for the fact that Anne Hubbard may have applied her brakes and for such variables as tires, road grade, temperature, and wind resistance.

Giving effect to these differences, but using the same mathematical formula the Commonwealth's witnesses had employed, David Lee opined that Anne Hubbard's speed at the beginning of the yaw was in the range of 65 to 70 m.p.h. This estimate, Lee said, comported with the "real life evidence" provided by the testimony of Mary Hamilton and David Cox "about the relationships between the [Hubbard and Cox] vehicles as they moved toward the scene of the accident." This testimony, Lee said, indicated that "at all times David was moving ahead or moving past Anne, was traveling faster than Anne and pulling away from her [yet

David testified] that his speed never exceeded 65 to 70 miles an hour."

## I.

Hubbard contends that the trial court "erred in permitting [the Commonwealth to introduce] reconstructed opinion evidence of speed in this criminal case." She says this Court has consistently rejected expert testimony concerning the speed of a vehicle derived simply from reconstructed evidence. Hubbard maintains we have taken the view that because speed is "a matter of common observation," *Moore* v. *Lewis*, 201 Va. 522, 525, 111 S.E.2d 788, 790 (1960), and the introduction of expert testimony on the subject would invade the province of the jury, *White* v. *Hunt*, 209 Va. 11, 17, 161 S.E.2d 809, 814 (1968), it is error to permit such testimony.

However, we do not reach the merits of Hubbard's argument, and we express no opinion on the question of the admissibility of the disputed evidence. Hubbard is confronted by a substantive rule of law which renders irreversible the action of the trial court in permitting the Commonwealth to introduce reconstructed opinion evidence of speed.

The rule is that "where an accused unsuccessfully objects to evidence which he considers improper and then on his own behalf introduces evidence of the same character, he thereby waives his objection, and we cannot reverse for the alleged error." *Saunders* v. *Commonwealth*, 211 Va. 399, 401, 177 S.E.2d 637, 638 (1970); *see also Snead* v. *Commonwealth*, 138 Va. 787, 801-02, 121 S.E. 82, 86 (1924); *Culbertson* v. *Commonwealth*, 137 Va. 752, 757, 119 S.E. 87, 88 (1923); *Hutchinson* v. *Commonwealth*, 133 Va. 710, 716-17, 112 S.E. 624, 626 (1922); *Snarr* v. *Commonwealth*, 131 Va. 814, 818, 109 S.E. 590, 592 (1921).

Hubbard argues, however, that in presenting the testimony of her experts, she was merely attempting to rebut the reconstructed opinion evidence of speed introduced by the Commonwealth. Hubbard says that "[t]he defense's own judgment on range of speed was based [not on theory but] primarily on real facts." It certainly is not the law, Hubbard opines, that a defendant waives the right "to appeal the use of 'ivory tower' theories by attempting to show their limitations in the real world."

We disagree with Hubbard. We think the testimony of Sammie and David Lee is reconstructed opinion evidence through

and through. Even David Lee's estimate of 65 to 70 m.p.h. as Hubbard's speed, based upon what he called the "real life evidence" provided by the testimony of Mary Hamilton and David Cox, is reconstructed opinion evidence. Lee merely took what Hamilton and Cox said "about the relationships between the [Hubbard and Cox] vehicles as they moved toward the scene of the accident" and reconstructed a scenario to which he applied his expertise to reach an opinion concerning Hubbard's speed.

We cannot characterize the expert testimony introduced by Hubbard any better than her counsel and David Lee characterized it in the trial court. Addressing a question to Lee, defense counsel asked: "As an accident reconstructionist, have you attempted to reconstruct the accident in accordance with your opinions and the evidence that you've heard?" The response: "That's right." There can be no doubt that the evidence introduced by Hubbard was "of the same character" as the evidence introduced by the Commonwealth and, accordingly, that the rule of *Saunders* applies.

## II.

Hubbard contends that the trial court "erred in excluding the evidence of the alcohol impairment, the erratic driving, and the emotional upset of [Susan Darr,] the driver of the Honda." Hubbard says "[t]he jury should have been allowed to hear this evidence and give it such weight as it felt appropriate."

In a proffer of the disputed evidence made out of the presence of the jury, Tyson Daniel testified that he and his date, Sarah Hailes, attended a party on the evening of the accident at a home off River Road west of the accident scene. Susan Darr and Catherine Davis also attended the party. Tyson saw Susan "sip off of one beer three or four times." He testified "[i]t could have been the same beer or it could have been her sixth beer, [he] really [did not] know."

Because Tyson had no car that evening, Susan agreed to give him and Sarah a ride to Sarah's home on Panorama Drive, which intersects River Road east of the accident site. The group left the party in Susan's Honda about 11:45 p.m., with Susan driving, Catherine Davis in the front passenger's seat, and Tyson and Sarah in the rear. Susan "had a beer when she got into the car and Catherine did too."

Susan drove "rather fast" as she went through the construction site on River Road, and the "right back tire of [the Honda went] over the white line . . . [o]n the side of the road." Sarah and Tyson asked Susan to slow down, and Catherine said, "don't kill us, Susan, or something like that." Susan did not slow down but continued at a speed described by Tyson as "[m]aybe" 60 to 65 m.p.h., although he "couldn't see the speedometer." Susan said "something to the effect [that she didn't] care" and "proceeded to tell . . . how she'd been [involved in a dispute with her parents earlier in the day]."

As the car entered the curve just west of Twin Lakes Lane, Tyson saw "a [tree] branch sticking [about six to twelve inches] out onto [the eastbound lane of] the road." Susan did not strike the branch because she was already across "the middle line" and into "the other lane."[7]

Several minutes later, the group reached Sarah's home and she and Tyson exited the vehicle. Susan Darr and Catherine Davis left immediately, presumably to head "back [to] River Road."

■ The trial court ruled inadmissible the evidence concerning Susan Darr's operation of the Honda during the trip to Sarah Hailes's home and the statements Susan made during that trip. The court also held inadmissible the evidence relating to Susan's alcohol impairment, including the results of a blood alcohol test performed during an autopsy on Susan Darr's body which showed blood alcohol content of 0.18% by weight by volume.

Hubbard argues that the disputed evidence was admissible to show that "but for Darr's erratic driving the fatalities would not have occurred." Hubbard says "[t]he proffered testimony [showed] that Darr was driving east on River Road at 60 to 65 MPH emotionally upset and impaired by alcohol minutes before the accident." She adds that "[t]he speedometer on the Honda was frozen at 65 MPH and the tachometer at 3500 RPM which correlated with the 65 MPH speed."[8]

---

[7] The trial court permitted Tyson Daniel to testify before the jury about the presence of the tree branch in the road. Using this testimony, Hubbard's expert witness, David Lee, opined that Hubbard had "gotten across the [center] line to avoid the branch, . . . [saw] the oncoming [Senter] vehicle, panicked, turn[ed] her car far to the right and then turn[ed] her car far to the left."

[8] A forensic scientist called as an expert witness by Hubbard testified that by the time she received the speedometer and tachometer in her laboratory they read 68 m.p.h. and 2600 to 2700 r.p.m., respectively. The witness also testified that, for a number of reasons, she could not express an opinion on the speed of the Honda at the time of impact based

Hubbard also says David Lee's "unanswered and unchallenged testimony . . . was that the Honda [must have been] in Hubbard's lane for there to have been contact and for the Honda to have made the gouge mark with the underneath location described by Officer Smith." Furthermore, Hubbard opines, David Lee, by use of a scale diagram of the accident scene and a cardboard cutout of Hubbard's Buick, "demonstrated conclusively that if the 'yaw mark' was [made by] the right front tire of the Buick, the Buick would not extend over the center line at impact." Thus, Hubbard maintains, the Honda "was encroaching the Buick's lane."

"There is no evidence," Hubbard submits, "that the Honda attempted evasive action as did the Senter vehicle or that the driver was in any way alert." Hubbard insists "[t]here was sufficient time to react and a simple veer back to [Darr's] lane would have avoided the collision." Instead, Hubbard asserts, Darr "continued over the line into the oncoming Buick."

Hubbard emphasizes that "[t]he blood alcohol content of the Honda operator was .18 at the moment of impact, almost twice the legal limit." Hubbard opines that "[h]ad the jury been so informed, they may have concluded that the alcohol impairment, which existed at the very moment of impact, and the erratic driving, which was evident on the trip east, supported the evidence that the Honda was in the east bound lane." Hence, Hubbard concludes, the trial court erred in ruling the proffered evidence inadmissible.

■ We disagree. On the subject of pre-accident speed, we said in *King* v. *Commonwealth*, 217 Va. 601, 231 S.E.2d 312 (1977), that "[w]e have been reluctant to permit an inference of excessive speed at one place on a highway from evidence of such speed at another place." *Id.* at 604, 231 S.E.2d at 315.

We noted in *King* that in *Grinstead* v. *Mayhew*, 167 Va. 19, 23, 187 S.E. 515, 517 (1936), we upheld the admission of evidence of excessive speed 1-¼ miles from the accident scene. We also noted that in *Slate* v. *Saul*, 185 Va. 700, 708-09, 40 S.E.2d 171, 174-75 (1946), we approved the admission of evidence of unlawful speed ½ to 1-1/5 miles from the scene of an accident, and that in *Interstate Veneer Co.* v. *Edwards*, 191 Va. 107, 111-12, 60 S.E.2d 4, 6

---

upon the speedometer needle being frozen at 65 m.p.h. In a discussion about the frozen reading, the trial judge asked defense counsel: [T]hat doesn't tell anything, does it?" Counsel replied: "Neither way."

(1950), we upheld the admission of evidence of excessive speed ¾ mile from the accident site, where a witness testified to the same speed when the vehicle was 400 yards from the scene.

Here, the aberrant driving observed by Tyson Daniel and the actual collision were separated by approximately 2.6 miles in distance and some 5 to 15 minutes in time. Further, John Senter testified that his vehicle was travelling 35 to 40 m.p.h., within the posted speed limit, immediately before the accident and that Darr was following closely behind. Under these circumstances, we do not think the trial court erred in excluding the evidence of Darr's "erratic driving" on the eastbound trip.

Nor do we find persuasive Hubbard's argument that the evidence of Darr's alcohol impairment would have supported the opinion given by her expert witness, David Lee. As noted, Lee opined that the Honda could not have made the gouge mark in the westbound lane unless the Honda was over the center line of the highway. Lee opined further that the placement of a cardboard cutout on the yaw mark shown on a diagram of the accident scene indicated that the front end of Hubbard's vehicle could not have extended over the center line at the time of impact.

Again, we cannot characterize the expert opinion testimony introduced by Hubbard any better than her counsel characterized it in the trial court. In arguing for admission of the evidence concerning Darr's alcohol impairment, Hubbard's counsel told the trial court that the opinion testimony introduced by the defense represented "evidence . . . *possibly* [placing Darr's] car . . . over into [Hubbard's] lane" at the time of impact. (Emphasis added.)

In *Spruill* v. *Commonwealth*, 221 Va. 475, 271 S.E.2d 419 (1980), the trial court refused to allow a psychiatrist to testify that it was a "possibility" the accused was insane on the day he abducted and raped the victim. *Id.* at 479, 271 S.E.2d at 421. In affirming the trial court, we said that an expert opinion "based on a 'possibility' is irrelevant, purely speculative and, hence, inadmissible." *Id.*

Here, the trial court did not hold that David Lee's opinion was inadmissible because based upon mere possibility. The fact remains, however, that the opinion was based upon nothing more than possibility, and evidence of Darr's alcohol impairment would not have removed it from the realm of speculation. Nor would the disputed evidence have supported the defense theory that, but for her alcohol impairment, Darr could have taken evasive action to

avoid the collision by making "a simple veer back to her lane." Since there was only a "possibility" Darr was out of her lane to begin with, evidence of her inability to "veer back" was irrelevant. Hence, given the speculative nature of David Lee's opinion, we cannot say that the trial court erred in refusing to admit the evidence of Darr's alcohol impairment.

■ Hubbard also argues that Darr's consumption of alcohol impaired her ability to take evasive action by turning off the road to the right, "as did the Senter vehicle." But, at best, Darr's failure to steer to the right would have been only a contributing cause of the ensuing collision.

> All of the authorities agree that contributory negligence has no place in a case of involuntary manslaughter [and] if the criminal negligence of the [accused] is found to be the cause of the death, [he] is criminally responsible, whether the decedent's failure to use due care contributed to the injury or not.

*Bell* v. *Commonwealth*, 170 Va. 597, 616, 195 S.E. 675, 683 (1938).

■ Only if the conduct of the deceased amounts to an independent, intervening act alone causing the fatal injury can the accused be exonerated from liability for his or her criminal negligence. *Mayo* v. *Commonwealth*, 218 Va. 644, 647, 238 S.E.2d 831, 833 (1977). In such case, the conduct of the accused becomes a remote cause. *Delawder* v. *Commonwealth*, 214 Va. 55, 57, 196 S.E.2d 913, 915·(1973).

■ Under no reasonable view of the evidence in this case could Hubbard's negligence be considered remote. The evidence of record, including the important eyewitness testimony of Mary Hamilton and John Senter, establishes beyond reasonable doubt that the Hubbard vehicle was proceeding along River Road at an exorbitant rate of speed, running out of control, and swerving from one lane to the other. "up to the very point in time and place" that the fatal collision occurred. *Id.*

## III.

■ Hubbard contends that the trial court erred in refusing three instructions she offered below. Refused Instruction A would have told the jury:

Where the defense is that the killing was an accident, the defendant is not required to prove this fact. The burden is on the Commonwealth to prove beyond a reasonable doubt that the killing was not accidental. If after [considering] all the evidence you have a reasonable doubt whether the killing was accidental or intentional, then you shall find the defendant not guilty.

The discussion in the trial court focused upon the last sentence of the instruction. We think the sentence is misleading; if the jury found the killing not accidental, it was not required to find the killing intentional in order to convict. The distinction the sentence should have drawn was not between accidental and intentional killing but between accidental killing and death resulting from willful and wanton negligence, which is the basis of a charge of involuntary manslaughter. Because the instruction did not make the proper distinction, it was not error to refuse it.

Refused Instruction B would have distinguished criminal negligence from civil negligence, stressing that there is a difference in both kind and degree between the two concepts. Refused Instruction C would have continued the discourse concerning criminal negligence vis-a-vis civil negligence. The instruction would have defined at length the civil terms "simple negligence" and "gross negligence" on the one hand and the criminal term "willful and wanton negligence" on the other.

We think that by attempting to inject inapplicable principles of civil negligence into a criminal trial, Instructions B and C would have created confusion and would have been misleading. Furthermore, they would have been duplicative.

In granted Instructions 5 and 6, the trial court correctly told the jury that the crime of involuntary manslaughter "is predicated solely upon criminal negligence" and that the Commonwealth must prove the killing was "the result of negligence so wanton and culpable as to show a reckless disregard of human life." In granted Instruction 7, the trial court properly told the jury that willful and wanton negligence "is acting consciously in disregard of another person's rights with reckless indifference to the consequences, with the defendant aware, from her knowledge of existing circumstances and conditions that her conduct would cause injury to another."

■ If an instruction "is not applicable to the facts and circumstances of the case, it should not be given." *Hatcher* v. *Commonwealth*, 218 Va. 811, 813-14, 241 S.E.2d 756, 758 (1978). And, "[w]hen granted instructions fully and fairly cover a principle of law, a trial court does not abuse its discretion in refusing another instruction relating to the same legal principle." *Stockton* v. *Commonwealth*, 227 Va. 124, 145, 314 S.E.2d 371, 384, *cert. denied*, 469 U.S. 873 (1984). The trial court did not err, therefore, in refusing Instructions B and C.

For the reasons assigned, we will affirm Hubbard's convictions.

*Affirmed.*

JUSTICE COMPTON, with whom JUSTICE STEPHENSON joins, concurring.

I join the Court's opinion and the Chief Justice's excellent analysis of the issues. I write separately only to make explicit that which is implicit in the opinion, that is, the Court is not endorsing the Court of Appeals' ruling approving the use of reconstructed opinion evidence of speed in this case, *Hubbard* v. *Commonwealth*, 12 Va. App. 250, 403 S.E.2d 708 (1991).

The Court finds it unnecessary to reach the merits of the defendant's argument on the subject, and properly expresses no opinion on the admissibility of the disputed evidence. If it were necessary to decide the issue, however, I would rule that the trial court erred in admitting the evidence and that the Court of Appeals erred in affirming the trial court's action.

The evidence on the subject offered by the prosecution violated the settled rule in this Commonwealth that the results of experiments are not admissible in evidence unless the tests were made under conditions which were the same or substantially similar in essential particulars to those existing at the time of the accident. *Swiney* v. *Overby*, 237 Va. 231, 233, 377 S.E.2d 372, 374 (1989); *Mary Washington Hosp.* v. *Gibson*, 228 Va. 95, 99, 319 S.E.2d 741, 743 (1984). The conditions under which the experimental tests in this case were conducted differed in essential particulars from those existing at the time of this unfortunate occurrence.

I have this additional observation. Under the doctrine of stare decisis, we are bound to invoke the waiver rule of *Saunders* v.

*Commonwealth*, 211 Va. 399, 401, 177 S.E.2d 637, 638 (1970), and we are bound to conclude that defendant waived her objection to the reconstructed opinion evidence of speed. If the Court were writing on a clean slate unencumbered by the *Saunders* precedent, however, I would not adopt such a rule because of its manifest unfairness to a defendant in a criminal case. The rule forces upon a defendant, who has evidence to offer of the same character as that objected to, the dilemma of either not objecting initially to the inadmissible evidence or, if an objection is overruled, not offering the evidence of the same character. This is a box into which I would not place a defendant in a criminal case.

Moreover, even with the *Saunders* rule in place, the rule, which is purely one of appellate procedure, may be unconstitutional because it chills the exercise of a defendant's right guaranteed by the Constitution of Virginia "to call for evidence in his favor." Va. Const. art. I, § 8. No constitutional issue has been raised in this case, however, so the Court cannot address it.

JUSTICE WHITING, dissenting.

I agree with the concurring opinion that the majority's application of a rule of purely appellate procedure in this case results in a "manifest unfairness to the defendant in a criminal case." However, I do not agree that the doctrine of *stare decisis* binds us to perpetuate this manifest unfairness.

I recognize that the doctrine of *stare decisis* is more than "a mere cliche" in Virginia. *Selected Risks Ins. Co. v. Dean*, 233 Va. 260, 265, 355 S.E.2d 579, 581 (1987). Whenever possible it ought to be applied because it gives stability and predictability to the laws by which people regulate their conduct. *See Kelly v. Trehy*, 133 Va. 160, 169, 112 S.E. 757, 760 (1922).

It is especially important in deciding contractual and property disputes. *Smith v. Coleman*, 183 Va. 601, 609, 32 S.E.2d 704, 707 (1945); *Postal Tel. Cable Co. v. Farmville & P.R.R.*, 96 Va. 661, 662, 32 S.E. 468, 470 (1899). The justification for the application of the rule is noted in our quotation of the following language from a Texas case:

'The doctrine grows out of the necessity for a uniform and settled rule of property, and definite basis for contracts and business transactions. If a decision is wrong, it is only when

it has been so long the rule of action as that time and its continued application, as the rule of right between parties, demand the sanction of its error; because when a decision has been recognized as the law of property, and conflicting demands have been adjusted, and contracts have been made with reference to and on the faith of it, greater injustice would be done to individuals, and more injury result to society by a reversal of such decision, though erroneous, than to follow and observe it.'

*Burks* v. *Hinton*, 77 Va. 1, 24 (1883) (citation omitted).

However, the doctrine of *stare decisis* is, after all, not "an imperative mandate, but a mere judicial custom, or convenient maxim, which the courts have evolved for their own guidance." William M. Lile, *Some Views on the Rule of Stare Decisis*, 4 Va. L. Rev. 95, 101 (1916). And where the previous precedent was contrary to reason, this Court is not bound to perpetuate such an error even though it involves the construction of a taxing statute. *Home Brewing Co.* v. *Richmond*, 181 Va. 793, 799, 27 S.E.2d 188, 191 (1943).

In deciding whether to apply the doctrine of *stare decisis* to overturn the appellate procedural rule of *Saunders* v. *Commonwealth*, 211 Va. 399, 401, 177 S.E.2d 637, 638 (1970), we should consider first the nature of the rights and interests involved. Obviously, no property or contractual rights are involved in this case.

In overruling a prior case involving construction of a statute dealing with the judicial terms of office, the Court continued the above quotation in *Burks* as follows:

'*But* when a decision is not of this character [involving property or contractual rights], upon no sound principle do we feel at liberty to perpetuate an error into which either our predecessors or ourselves may have inadvertently fallen, merely upon the ground of such erroneous decision having been previously rendered. . . . In such case the former decision or previous construction is received and weighed merely as an authority, tending to convince the judgment of the correctness of the particular conclusion, and not as a rule to be followed without inquiry into correctness.' (Citation omitted).

*Burks*, 77 Va. at 24-25 (emphasis in original).

The Commonwealth cannot claim reliance upon the *Saunders* rule prior to its introduction of the disputed evidence. In criminal prosecutions, it should introduce only admissible evidence; its contention was, and is, that the evidence was admissible. Its reliance claim can only be upon this appellate procedural rule that effectively forces the defendant to choose between an effective defense before a jury or one before this Court. Measured against the defendant's right to a fair trial and to present evidence in her defense, the Commonwealth's reliance claim pales into insignificance.

Next, we must consider the impact of our overruling this procedural rule upon the past or future conduct of the Commonwealth and defendants in criminal cases. Such a decision would have no effect on past criminal cases because it involves a prospective change in a procedural rule. It could only have a salutary effect on future cases by providing a level playing field at trial *and* on appeal.

Accordingly, I would overrule that part of *Saunders* and our other criminal cases that enforce this rule, reverse this case, and remand it for further proceedings consistent with the views expressed herein.