COURT OF APPEALS OF VIRGINIA

Present:    Chief Judge Huff, Judges Chafin and Russell
Argued by teleconference

DANIEL ELWOOD BUCHANAN, S/K/A
  DANIEL ELWOOD BUCHANAN, JR.
                                                    MEMORANDUM OPINION[*] BY
v.      Record No. 1253-14-3                        JUDGE TERESA M. CHAFIN
                                                    MAY 5, 2015
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF BRISTOL
Sage B. Johnson, Judge

David L. Harmon (David L. Harmon, P.C., on brief), for appellant.

Donald E. Jeffrey, III, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


At the conclusion of a two-day trial held in the Circuit Court of the City of Bristol

("circuit court"), a jury convicted Daniel Elwood Buchanan, Jr., ("Buchanan") of second-degree

murder in violation of Code § 18.2-32 and the use of a firearm in the commission of that murder

in violation of Code § 18.2-53.1.  On appeal, Buchanan contends that the circuit court erred by

failing to suppress text messages obtained from his cell phone that referenced his relationship

with the murder victim and the events that took place on the night the victim was killed.  He also

challenges the sufficiency of the evidence supporting his convictions.  For the reasons that

follow, we affirm Buchanan's convictions.

I.  BACKGROUND

"On appeal, 'we review the evidence in the light most favorable to the Commonwealth,

granting to it all reasonable inferences fairly deducible therefrom.'"  Archer v. Commonwealth,

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

26 Va. App. 1, 11, 492 S.E.2d 826, 831 (1997) (quoting Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987)).  So viewed, the evidence established that Buchanan shot and killed Chase Robbins ("Robbins") in the early morning hours of November 18, 2012 following a series of altercations.

### A.  THE ALTERCATIONS BETWEEN BUCHANAN AND ROBBINS

On Friday, November 16, 2012, Buchanan allowed Robbins and his girlfriend, Chasity Couch ("Couch"), to stay at his apartment through the weekend.  Robbins and Couch were both homeless, and they were friends with Buchanan's girlfriend, Gina Kennedy ("Kennedy").  Buchanan told Robbins to leave his apartment the following day after he got into an argument with Couch, Kennedy, and Kennedy's two children.  Robbins refused to leave, and an altercation ensued between Robbins and Buchanan during which Buchanan physically removed Robbins from the apartment.  Couch testified that Buchanan pointed a gun at Robbins's head during this disagreement.

Buchanan called 911 shortly after his altercation with Robbins.  When officers arrived to investigate the incident, Robbins told them that Buchanan had held something that felt like a gun to his head.  Buchanan refused to press trespassing charges against Robbins, and Robbins agreed to leave the area.  Although Robbins did not appear intoxicated, a preliminary breath test revealed that his breath had an alcohol concentration of 0.05 gram per 210 liters.

Buchanan called 911 three more times that evening and complained that Robbins had returned to his apartment.  He told the 911 dispatcher that he was tired of Robbins returning and that he would shoot Robbins if he came back again and "feel good about it."[1]  When Officer Marc Edwards ("Edwards") arrived at Buchanan's apartment after the third 911 call, he saw

---

[1] Recordings of each of Buchanan's calls to 911 were played for the jury at his trial.

Robbins lying in a ditch on an adjacent property. Robbins told Edwards that he was going to sleep in the ditch and that he would not return to Buchanan's apartment or its premises. Although Edwards explained to Buchanan that Robbins wanted to be arrested due to the cold weather that night and that Robbins's arrest would diffuse the situation by removing him from the area, Buchanan again refused to file a trespassing complaint against Robbins.

Buchanan called 911 at 12:47 a.m. and told the dispatcher that he had shot Robbins. He explained that Robbins had "jumped him" when he approached him and told him that he needed to leave the area. When the police arrived, they found Robbins slumped against a small tree. He had been shot once in the chest, and medical personnel pronounced him dead at the scene. Buchanan was not injured. After being advised of his <u>Miranda</u> rights, Buchanan told the investigating officers that Robbins had attacked him with a two-liter bottle and that he had shot him in self-defense. The investigating officers then took Buchanan into custody and seized his cell phone and the gun he used to shoot Robbins. Officers found an empty plastic two-liter bottle near Robbins's body and a piece of metal rebar in the area where Robbins had been lying that had nylon wrapped around one end to form a handle.

When Buchanan arrived at the police station following the shooting, he explained that he was frustrated by the "drama" of the evening and that he decided that everyone should leave his apartment sometime after his fourth 911 call. After he told Couch and Kennedy that they were going to have to leave his apartment that night, Buchanan approached Robbins to tell him that he had to leave the area and that he would give him a ride to another location. Buchanan claimed that Robbins suddenly grabbed his legs and pulled him to the ground. He said that Robbins then got on top of him and started hitting him in the head with his fists and an object that he later realized was a plastic two-liter soda bottle. While the officers that responded to the scene throughout the night did not see Buchanan carrying a weapon, Buchanan explained that he

- 3 -

always carried a gun for protection against drug users that frequently stayed in the area and that he reached for his gun and shot Robbins while he was on top of him hitting him with the bottle.

## B.  THE TEXT MESSAGES

Detective Angela Simpson ("Simpson") returned to her desk following Buchanan's interview to draft paperwork incidental to Buchanan's arrest.  She still had Buchanan's cell phone with her, and she placed it on her desk while she was working.  Buchanan's cell phone was made by Blackberry, a brand with which Simpson was unfamiliar, and she believed that the cell phone was turned off at this time.  She realized that the phone was still on, however, when it started beeping, and she attempted to turn the phone off to prevent the potential "remote wiping" of the digital data stored on the phone.[2]  As she was attempting to turn the phone off, Simpson saw several incoming text messages from Serena Pickle ("Pickle") asking if Buchanan was alright.  Simpson explained that these messages simply "popped up" on the screen, and she testified that she did not search through the contents of the phone at this time.

Believing that the text messages referenced the events of the prior evening, Simpson obtained a warrant to search Buchanan's cell phone.[3]  Special Agent John Singleton ("Singleton") of the Virginia State Police, a specialist in cell phone technology and data recovery, searched Buchanan's cell phone and retrieved numerous text messages from the device that referenced Buchanan's relationship with Robbins and the events that occurred on the night

---

[2] In the process known as "remote wiping," a signal sent across a wireless network from a remote source erases the digital data stored on a cell phone. See Riley v. California, 134 S. Ct. 2473, 2486 (2014).  Remote wiping can be prevented by turning off the cell phone and removing its battery or placing the cell phone in a metal enclosure that blocks incoming data from the phone.  See id. at 2487.  In this case, Buchanan's phone was stored in an empty paint can before it was searched pursuant to a warrant.

[3] In her affidavit for the warrant to search Buchanan's phone, Simpson stated that "Daniel Buchanan Jr. admitted to shooting Chase Robins [sic] after an altercation over trespassing.  While Buchanan was detained in the interview room a message appeared on his cell phone containing information related to the altercation with Robins [sic]."

of November 17, 2012 and the early morning of December 18, 2012. Many of these messages were incriminatory in nature, and in several of the messages Buchanan explicitly discussed his desire to shoot and kill Robbins.

Prior to his trial, Buchanan filed a motion to suppress all of the text messages obtained from his cell phone. Buchanan argued that Simpson illegally searched his phone when she viewed the initial messages from Pickle and that she would not have had probable cause to obtain a search warrant for the phone without viewing those messages.[4] Buchanan testified that Simpson would have had to take at least three steps to access text messages on his cell phone and that the messages would not have "popped up" automatically as she attempted to power down the phone. Simpson, however, maintained that she did not take any action to search the contents of the phone and that the messages were displayed on the screen of the phone as she was turning off its power. The circuit court denied Buchanan's motion to suppress, concluding that Simpson had not searched the phone. The circuit court found that Simpson had simply read the text messages as they popped up on the screen of the phone and that she did not take any further action to explore its contents.

## C. THE TRIAL

At Buchanan's trial, the Commonwealth called Singleton as a witness to testify about the digital content that he recovered from Buchanan's phone. During its examination of Singleton,

---

[4] At the hearing on Buchanan's motion to suppress, he also briefly argued that Simpson's affidavit based on the text messages she viewed did not establish probable cause to search Buchanan's cell phone. He did not include this argument in his written motion to suppress the text messages that he previously filed with the circuit court or request a separate hearing on this issue pursuant to Franks v. Delaware, 438 U.S. 154 (1978). The circuit court also did not base its decision to deny the motion on this argument. See Riner v. Commonwealth, 268 Va. 296, 324-25, 601 S.E.2d 555, 571 (2004). Given these circumstances, we note that we would likely decline to consider this argument on appeal even if we held that Buchanan had not waived his arguments concerning the text messages by introducing similar evidence on his own behalf.

the Commonwealth introduced into evidence a series of text messages between Buchanan and Pickle from November 17, 2012, that included several messages in which Buchanan discussed his intent and desire to shoot and kill Robbins. On November 17, 2012, hours before he shot Robbins, Buchanan sent text messages to Pickle stating: "I am probably going to have to kill a crackhead tonight," "I just had to beat up a violent drunk in my driveway," "I was squeezing the trigger. I almost shot the guy before he just dropped in the grass," "[i]f he comes back I'm going to beat him into a permanent coma," "Told the cops if he comes back I'm just going to shoot him. They told the guy I was within my rights to do so," "I wish I had just shot the f*cker," "The only reason he isn't dead is because Gina is here with her kids," "[C]ould have and intended to kill someone and I do not feel bad about it," and "If he comes back and I double tap his ass the cops said its justified."

On cross-examination, Buchanan asked Singleton about additional text messages that he retrieved from Buchanan's phone. Specifically, Buchanan asked Singleton about a message that he sent to Missy Jones ("Jones") on November 11, 2012 that stated "She got into a fight with her [boyfriend] and I had to explain to her [boyfriend] that if he did not calm down, that he would be shot and killed and I would not feel bad about it." Additional text messages established that this message referred to Couch and Robbins. Buchanan then asked Singleton about text messages that he sent to Pickle on November 11 and 12, 2012 that contained threats to Robbins that were similar to those he made in the text messages he sent on November 17.

In addition to Couch and the officers that responded to the scene, the Commonwealth also called several experts to testify at Buchanan's trial. An expert in the field of DNA analysis testified that Buchanan's DNA was present on the piece of rebar found at the crime scene, and that Robbins's DNA was not present on the rebar. An Assistant Chief Medical Examiner for the Commonwealth of Virginia testified about an autopsy he performed on Robbins. The examiner

confirmed that the gunshot wound to Robbins's chest caused his death, and explained that the fatal bullet entered his body just below the clavicle on the left side of his chest and traveled through his body on a downward trajectory, piercing several organs before coming to rest near his spine. The examiner opined that such a trajectory would have been unlikely if Robbins was shot by someone underneath him, and noted that a similar trajectory is more commonly encountered when someone standing above his or her victim shoots down at them.

Buchanan testified on his own behalf in his case-in-chief. He explained to the jury that Robbins had attacked him, and his testimony was consistent with the statements he made to the police while he was in their custody. Robbins also explained that the text messages that he sent to Pickle were mere bravado. He testified that he frequently texted Pickle about "all kinds of strange stuff that never happened" to appear as a "Billy Badass" and that Pickle responded by telling him that he was "cool" and "awesome." On redirect examination, Buchanan expressly addressed the text messages that he sent to Pickle and Jones on November 11 and 12, 2012, and emphasized that he did not act on the threats contained in those messages. In his closing argument, Buchanan again referred to the text messages that he sent to Pickle and Jones that he "introduced through Detective Singleton's cross-examination." Buchanan explained that he did not act on the threats contained in those messages, and again explained that they were mere bravado.

The jury convicted Buchanan of second-degree murder in violation of Code § 18.2-32 and the use of a firearm in the commission of that murder in violation of Code § 18.2-53.1. He was sentenced to a forty-year term of incarceration for his murder conviction and a three-year term of incarceration for his firearm conviction. Buchanan appealed both of his convictions to this Court.

## II. ANALYSIS

On appeal, Buchanan argues that the circuit court erred by failing to suppress the text messages obtained from his cell phone. Buchanan contends that Simpson illegally searched his cell phone when she viewed the initial messages from Pickle asking if he was alright. Buchanan also claims that probable cause did not support the warrant for the search of his phone and that the evidence presented by the Commonwealth was insufficient to support his convictions. After reviewing the record of this case, we conclude that Buchanan has waived his objection to the text messages obtained from his cell phone by introducing similar text messages on his own behalf and attempting to explain them in a light more favorable to him. Therefore, we are not required to address the substance of Buchanan's arguments concerning the text messages. We also conclude that the evidence is sufficient to support Buchanan's convictions.

### A. BUCHANAN HAS WAIVED HIS OBJECTION TO THE TEXT MESSAGES OBTAINED FROM HIS CELL PHONE

"[W]hen a litigant 'unsuccessfully objects to evidence that he considers improper and then introduces on his own behalf evidence of the same character, he waives his earlier objection to the admission of that evidence.'" Isaac v. Commonwealth, 58 Va. App. 255, 260, 708 S.E.2d 435, 437 (2011) (quoting Combs v. Norfolk & W. Ry., 256 Va. 490, 499, 507 S.E.2d 355, 360 (1998)). This principle "has stood in roughly the same form for well over a century," and it applies to both criminal and civil cases. See id. It applies to objections based on constitutional grounds, as well as to those based on statutory and common law. See id.; see also Bynum v. Commonwealth, 28 Va. App. 451, 459, 506 S.E.2d 30, 34 (1998).

"An exception to the same-evidence principle exists for evidence elicited 'during cross-examination of a witness or in rebuttal testimony.'" Isaac, 58 Va. App. at 261, 708 S.E.2d at 438 (quoting Zektaw v. Commonwealth, 278 Va. 127, 143, 677 S.E.2d 49, 52-53 (2009)).

Virginia courts, however, have applied this exception in very limited circumstances, and explained that rebuttal evidence does not encompass the entirety of a criminal defendant's case-in-chief. See id. "[A] litigant waives an objection to evidence when he introduces 'evidence dealing with the same subject as part of his own case-in-chief," id. at 260, 708 S.E.2d at 437 (emphasis omitted) (quoting Pettus v. Gottfried, 269 Va. 69, 79, 606 S.E.2d 819, 825 (2005)), and "[t]he rebuttal exception . . . does not apply when the defendant presents in his case in chief the same or similar evidence he previously objected to in order to explain it away or to offer a more favorable interpretation," id. at 262, 708 S.E.2d at 438. Furthermore, the same-evidence principle is "'properly and logically applicable in any case, regardless of the order of introduction, if the party who has brought out the evidence in question, or who has permitted it to be brought out, can be fairly held responsible for its presence in the case.'" Pettus, 269 Va. at 79, 606 S.E.2d at 825 (quoting Whitten v. McClelland, 137 Va. 726, 741, 120 S.E. 146, 150 (1923)).

Although Buchanan moved to suppress all of the text messages obtained from his cell phone, he referred to numerous text messages from the phone in his cross-examination of Singleton and when he testified in his case-in-chief. Buchanan cross-examined Singleton about the messages he sent to Pickle on November 17, 2012 that the Commonwealth introduced into evidence. Buchanan then exceeded the scope of the Commonwealth's direct examination of Singleton and questioned him about additional messages sent to Jones and Pickle on November 11 and 12, 2012. These messages were substantially similar to the messages introduced into evidence by the Commonwealth. They contained threats made by Buchanan to shoot and kill Robbins. By exceeding the scope of the Commonwealth's examination of Singleton, Buchanan introduced these additional statements as evidence on his own behalf and, accordingly, the cross-examination exception to the same-evidence principle does not apply to them. See Newton

v. Commonwealth, 29 Va. App. 433, 451, 512 S.E.2d 846, 854 (1999) ("Having solicited evidence of the same character on cross-examination, appellant is precluded from claiming that it was error for the Commonwealth to have introduced evidence of the same nature.").

Moreover, in his case-in-chief, Buchanan attempted to explain away the text messages that he sent to Pickle. He testified that the messages were mere bravado and that he did not act on the threats that he made in the messages. On redirect examination, Buchanan expressly referenced the messages that he sent to Jones and Pickle on November 11 and 12, 2012, and explained that he did not act on the threats to Robbins that he made in the messages. In his closing argument, Buchanan referred the jury to the text messages that he "introduced through Detective Singleton's cross-examination," and explained that he never acted on his previous threats to Robbins.

Given these circumstances, Buchanan has waived his objection to the text messages obtained from his cell phone. He introduced substantially similar messages on his own behalf, and attempted to explain the messages introduced by the Commonwealth in a light more favorable to his defense. Accordingly, a substantive rule of law prohibits us from considering Buchanan's arguments concerning the text messages. See Hubbard v. Commonwealth, 243 Va. 1, 9, 413 S.E.2d 875, 879 (1992).

### B. SUFFICIENT EVIDENCE SUPPORTED BUCHANAN'S CONVICTIONS

When considering the sufficiency of the evidence on appeal, we "presume the judgment of the trial court to be correct" and reverse only if the trial court's decision is "plainly wrong or without evidence to support it." Davis v. Commonwealth, 39 Va. App. 96, 99, 570 S.E.2d 875, 876-77 (2002); see also McGee v. Commonwealth, 25 Va. App. 193, 197-98, 487 S.E.2d 259, 261 (1997) (*en banc*). Under this standard, "a reviewing court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Crowder v.

Commonwealth, 41 Va. App. 658, 662, 588 S.E.2d 384, 387 (2003) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)).  It asks instead whether "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*) (quoting Jackson, 443 U.S. at 319).  We do not "substitute our judgment for that of the trier of fact" even if our opinion were to differ.  Wactor v. Commonwealth, 38 Va. App. 375, 380, 564 S.E.2d 160, 162 (2002).

"'In Virginia, every unlawful homicide is presumed to be murder of the second degree.'"  Tizon v. Commonwealth, 60 Va. App. 1, 10-11, 723 S.E.2d 260, 264 (2012) (quoting Pugh v. Commonwealth, 223 Va. 663, 667, 292 S.E.2d 339, 341 (1982)).  "'Murder . . . is a homicide committed with malice, either express or implied.'"  Id. at 11, 723 S.E.2d at 264 (quoting Pugh, 223 Va. at 667, 292 S.E.2d at 341).  "Malice inheres in the 'doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will,'" and may be inferred from the deliberate use of a deadly weapon.  Id. at 11, 723 S.E.2d at 265 (quoting Dawkins v. Commonwealth, 186 Va. 55, 61, 41 S.E.2d 500, 503 (1947)).  Killing in self-defense, however, may be either justifiable or excusable homicide.

> "Justifiable homicide in self-defense occurs where a person, without any fault on his part in provoking or bringing on the difficulty, kills another under reasonable apprehension of death or great bodily harm to himself."  Bailey v. Commonwealth, 200 Va. 92, 96, 104 S.E.2d 28, 31 (1958); Dodson v. Commonwealth, 159 Va. 976, 167 S.E. 260 (1933).  "Excusable homicide in self-defense occurs where the accused, although in some fault in the first instance in provoking or bringing on the difficulty, when attacked retreats as far as possible, announces his desire for peace, and kills his adversary from a reasonably apparent necessity to preserve his own life or save himself from great bodily harm."  Bailey, 200 Va. at 96, 104 S.E.2d at 31.

Yarborough v. Commonwealth, 217 Va. 971, 975, 234 S.E.2d 286, 290 (1977).

Buchanan admitted that he shot and killed Robbins on November 18, 2012. He explained to the jury that he shot Robbins in self-defense after Robbins attacked him. Buchanan claimed that he shot Robbins while Robbins was on top of him hitting him in the head with a two-liter bottle and his fists. The jury, however, rejected Buchanan's version of the events and concluded that he killed Robbins with malice.[5] Ample evidence supported the jury's decision.

Buchanan's animosity towards Robbins was well-documented and clearly established. On the night that he shot Robbins, Buchanan sent text messages to Pickle expressing his desire to shoot and kill Robbins. He sent similar messages to Pickle and Jones nearly a week before the killing. He also told the 911 dispatcher that answered one of his calls that he was going to shoot Robbins and "feel good about it." Buchanan was frustrated and angry at Robbins, and he had physically wrestled him out of the apartment before he called the police. Couch testified that Buchanan pointed a gun at Robbins's head during this altercation, and Robbins told the police that Buchanan had held something against his head that felt like a gun.

Although the police officers that responded to Buchanan's 911 calls told him that they would arrest Robbins if he filed a criminal trespassing complaint against him, Buchanan refused to do so. Instead, he allowed Robbins to remain in the area and spend the night in a nearby ditch. He then approached Robbins armed with a gun and a piece of metal rebar and told him to leave the area.[6] While Buchanan testified that Robbins attacked him, he was not injured during the alleged assault. Edwards testified that Robbins was not belligerent during their interactions that evening and that he did not appear to be intoxicated. Moreover, the testimony of the medical

---

[5] "The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." Elliott v. Commonwealth, 277 Va. 457, 462, 675 S.E.2d 178, 181 (2009).

[6] While Buchanan testified that he was not carrying the rebar when he approached Robbins, DNA analysis established that it had been in his possession.

examiner that performed an autopsy on Robbins also cast doubt on Buchanan's description of the attack. The downward trajectory of the bullet that killed Robbins suggested that he was not shot by someone who was pinned underneath him.

Under these circumstances, the jury reasonably concluded that Buchanan's version of the shooting was not credible. The jury was "at liberty to discount [Buchanan's] self-serving statements as little more than lying to conceal [his] guilt, and could treat such prevarications as affirmative evidence of guilt." Armstead v. Commonwealth, 56 Va. App. 569, 581, 695 S.E.2d 561, 567 (2010) (citation and internal quotation marks omitted). Based on Buchanan's animosity towards Robbins, evidenced by numerous statements in which he expressed a desire to shoot and kill him, the jury could infer that Buchanan killed Robbins with malice. Accordingly, we conclude that the evidence presented supported both of Buchanan's convictions.

III. CONCLUSION

In conclusion, we find that Buchanan waived his objection to the text messages obtained from his cell phone when he introduced text messages of a similar nature on his own behalf and attempted to explain the text messages introduced by the Commonwealth in a light more favorable to his defense. Additionally, we conclude that the evidence presented was sufficient to support Buchanan's convictions. For these reasons, we affirm Buchanan's convictions.

Affirmed.