Present:  All the Justices

PATRICIA A. DRINKARD-NUCKOLS,
EXECUTOR OF THE ESTATE OF BERMUDA H.
DRINKARD, DECEASED

v.  Record No. 040585  OPINION BY JUSTICE CYNTHIA D. KINSER
                                        January 14, 2005
WILLIAM C. ANDREWS, JR., M.D.,
ET AL.

          FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
                      Mosby G. Perrow, III, Judge


     In this medical malpractice action, the plaintiff

objected to the introduction of evidence concerning what

the defendant doctors expected from other physicians with

regard to the handling and communication of the

interpretation of an x-ray, thereby suggesting that

physicians other than the defendants were negligent.

Because the plaintiff presented testimony on the same

subject in her case-in-chief, her objection is waived and

the circuit court's admission of such evidence cannot be

grounds for reversal.  Thus, we will affirm the judgment of

the circuit court.

     Bermuda H. Drinkard was seen in the emergency room at

the Lynchburg General Hospital on March 7, 2000,

complaining of left shoulder, wrist, and arm pain as a

result of a fall that she had sustained.  Dr. Patrick

Wynnyk initially treated Drinkard in the emergency room and

diagnosed a left wrist fracture based on the results of x-rays of her left arm and wrist.  Consequently, Dr. Wynnyk contacted the orthopedic surgeon on call, Dr. William C. Andrews, Jr., about treating Drinkard's fracture.  Dr. Andrews subsequently arrived at the emergency room, at which time Dr. Wynnyk turned Drinkard's care over to Dr. Andrews.  Dr. Wynnyk did not see Drinkard again.  Upon evaluating Drinkard, Dr. Andrews discharged her from the emergency room to return home but scheduled her for out-patient wrist surgery the following day.[1]

At some point during Drinkard's treatment in the emergency room, an x-ray of her chest was taken.[2]  Dr. Kiah T. Ford, III, a radiologist, interpreted the x-ray and found a four-centimeter mass in Drinkard's left lung.  Dr. Ford opined that the mass was a "significant" and "unexpected" finding, requiring further evaluation.  However, he admitted that he did not personally contact Dr. Wynnyk or any other physician with regard to his

---

[1]  Although the medical records indicated that Dr. Andrews discharged Drinkard from the emergency room, he disputed that he was the physician who did so.

[2]  The evidence was disputed as to who ordered the chest x-ray.

2

interpretation of the chest x-ray.[3]  Nor did he communicate his findings to Drinkard.  Instead, he sent a "wet read"[4] and the x-ray films back to the emergency room, and dictated his report, which he believed was available to any physician at the hospital.

The next day, when Drinkard underwent out-patient surgery for her fractured wrist, Dr. Ford's written report concerning Drinkard's chest x-ray was in her chart. However, Dr. Andrews never looked through Drinkard's chart before the surgery even though a nurse had noted on the chart abnormal test results with regard to the chest.  Nor did the anesthesiologist point out the abnormal chest x-ray to Dr. Andrews on the day of surgery.  Thus, Dr. Andrews did not review or know about Dr. Ford's interpretation of the chest x-ray at that time or at any time during the ensuing three months when he saw Drinkard in his office on six occasions.  Consequently, he never communicated to Drinkard the fact that she had a mass in her left lung.

On September 14, 2000, Drinkard saw her family doctor, who diagnosed her as "chronically ill" and ordered a chest

---

[3]  Dr. Ford did not know at that point that Dr. Andrews had been called in to consult on Drinkard's condition.

[4]  A "wet read" is the radiologist's hand-written diagnosis on the x-ray.

3

x-ray and CT scan. Those tests revealed a large tumor that had grown since the March 2000 chest x-ray and was at that time "incurable cancer." This was the first time Drinkard learned that she had lung cancer. Drinkard subsequently died on October 10, 2000, due to the progression of the cancer.

Patricia A. Drinkard-Nuckols, as executor of Drinkard's estate, then filed this medical malpractice, wrongful death action against Dr. Andrews; Piedmont Orthopaedic Surgery, Inc. ("Piedmont Orthopaedic"), Dr. Andrew's employer; Dr. Ford; and Radiology Consultants of Lynchburg, Inc., Dr. Ford's employer (collectively, "the defendants").[5] Drinkard-Nuckols alleged that the defendants failed "to inform [Drinkard] that there was a mass in her chest that needed further exploration, . . . failed to inform [Drinkard] that she had a primary pulmonary neoplasm, and . . . failed to follow through to provide treatment . . . so that [Drinkard] would stand a reasonable chance of being cured of what turned out to be lung cancer."

---

[5] Drinkard-Nuckols also named Dr. Wynnyk and Centra Health, Inc. d/b/a Lynchburg General Hospital as defendants. Before trial, she nonsuited her claims against these defendants.

Before trial, Drinkard-Nuckols filed a motion in limine to exclude any evidence and/or argument suggesting that health care providers other than the defendants were negligent. After hearing argument of counsel, the circuit court sustained the motion in part, ruling that the defendants could not present expert testimony that someone else was negligent. However, the court stated that the defendants could present testimony "as to why the [d]efendants did not violate the standard [of care], because the [d]efendants don't normally take these things, these x-rays and do what [the plaintiff claims] they should have done."

At trial, a jury returned a verdict in favor of the defendants. The circuit court subsequently entered a final order in accordance with the jury verdict. We awarded Drinkard-Nuckols this appeal.

The question presented on appeal by Drinkard-Nuckols is whether the circuit court erred in allowing testimony from Dr. Andrews and Dr. Ford, as well as an expert witness, about what Dr. Andrews and Dr. Ford could expect from other physicians with regard to the handling and communication of the interpretation of the decedent's chest x-ray. Drinkard-Nuckols asserts that such testimony introduced evidence of negligence by non-party physicians;

that such negligence was not a superseding, intervening cause of Drinkard's death; and that it was therefore irrelevant to any matter at issue in the case. The introduction of what Drinkard-Nuckols dubs "expectation evidence" was, according to her, "simply an attempt to introduce through the back door evidence that some other physician, who was not a party to the action, was negligent."

Drinkard-Nuckols complains about the following testimony and argues that it was inadmissible "expectation evidence":

(1) Cross-examination of Dr. Andrews by his attorney after Drinkard-Nuckols called him as an adverse witness in her case-in-chief:

> Q: Now once the patient comes to the actual operating area on a different floor and the anesthesiologist reviews the records, what is your expectation in terms of what the . . . anesthesiologist is going to do in terms of the chest x-ray?
>
> A: The anesthesiologist in our hospital reviews all of the pertinent data to decide whether a patient can or cannot undergo surgery. That's part of their normal preoperative routine.
>
> Q: If there's an abnormality such as was noted in this case, what's your expectation about that information being brought to your attention?
>
> A: My expectation would be that - my expectation is that the abnormality would be pointed out to the anesthesiologist, who would then point it out to me.

Q: Did that happen in this case?

A: No.

Q: And is that your typical experience, typical practice?

A: Yes.

Q: All right. And with that practice, is there any reason for you to go behind that and look for that information in the chart yourself?

A: None.

Q: All right. And did you in fact do that in this case?

A: No I did not.

(2) Direct examination of Dr. Andrews by his

attorney:

Q: Now, in terms of your practice with Lynchburg General Hospital, what is your expectation about what the anesthesiologist is going to do if, in fact, there's an abnormality noted in the chest x-ray?

A: The anesthesiologist, when he or she reviews the chart, if there's ever an anomaly, they always tell us.

Q: Has that, in fact, been your experience?

A: Yes.

. . .

Q: Who do you get the information from?

A: The anesthesiologist.

Q: Did that occur in this case?

7

A:  No, it did not.

(3) Direct examination of Dr. Michael O'Brian, an expert witness in the field of orthopedic surgery who testified on behalf of Dr. Andrews:

Q:  And in that setting in the operating room, what is our expectation about being advised if there is an abnormality in the chest x-ray report?

A:  I've had it happen to me.  The anesthesiologist will say before we start the case Dr. O'Brian we have a problem.  This chest x-ray is abnormal.  In this case it's cancelled frequently.

Q:  And in your opinion, is that what Dr. Andrews' expectation was and should have been in this case?

A:  Absolutely.

. . .

Q:  From your standpoint as a member of [an orthopedic surgery] team, what is your expectation about where you're going to learn[,] . . . [f]rom what . . . person are you going to learn if there is a problem with the chest x-ray?

A:  . . . [I]f it's a significant finding I'll get a phone call from the radiologist who's read the x-ray, or sometimes it's the emergency room physician who has reviewed the x-ray . . . . In the surgical setting it's the anesthesiologist or his associate that will inform me.

. . .

Q:  Once you get to the operating room, whose job is [it to look at the chart]?

A:  . . . [I]t's the anesthesiologist who decides yes or no it's okay to proceed with

8

anesthesia.  So I would rely very much to alert me to an abnormal chest x-ray.

    Q:  In your opinion, if Dr. Andrews relied on that in the operating room, in this case was that acceptable for what a reasonably prudent orthopedist would do?

    A:  No question.

(4) Direct examination of Dr. Ford by Drinkard-Nuckols when she called him as an adverse witness during her case-in-chief:

    Q:  [I]n the radiology department, your expectation is when you send [a report] to outpatient surgery, your expectation is the doctor who is listed by M.D. will not only receive it, but review it, is it not?

    A:  My expectation is an agent or physician in outpatient will read this.

    Q:  And Dr. Andrews will read it.

    A:  My training is . . . generally the physician whose name is there would be the one reading it.  But that is not always the case.

    Q:  And that was your expectation when this stuff was sent out to the various physicians, was that . . . Dr. Andrews, the attending physician . . . would review this interpretation, was it not?

    A:  . . . I have no expectation right now that Dr. Andrews did it.
    I would not expect that, but I would not be surprised if he did.  But if he did not and some other physician looked at it, that would be expected.

    Q:  Are you saying that you would not expect Dr. Andrews to review this?

9

A:  I would expect some physician in outpatient to read it.

. . .

Q:  Well, when this report was sent out, what specific physician were you sure of that was going to receive this and review this interpretation?  What specific physician?

A:  I was sure that the physician in the emergency room would see my report and my wet read.

Dr. Andrews and Piedmont Orthopaedic point out that Dr. Ford's testimony was of the same nature and character as the "expectation evidence" to which Drinkard-Nuckols objected in her motion in limine and now claims was erroneously admitted by the circuit court.  Relying on this Court's decision in Combs v. Norfolk & W. Ry. Co., 256 Va. 490, 499, 507 S.E.2d 355, 360 (1998), Dr. Andrews and Piedmont Orthopaedic argue that, because Drinkard-Nuckols introduced this evidence during her case-in-chief, she waived her objection to the introduction of "expectation evidence" and cannot now assert on appeal that the circuit court erred in admitting such evidence.  We agree.

Many years ago, this Court enunciated the rule relied upon by Dr. Andrews and Piedmont Orthopaedic: " 'If a party objects to the introduction of evidence which is admitted, and afterwards introduces the same evidence himself, it is not ground for reversing the judgment, although the

10

evidence itself was incompetent.' " Southern Ry. Co. v. Blanford, 105 Va. 373, 387, 54 S.E. 1, 6 (1906) (quoting New York Life Ins. Co. v. Taliaferro, 95 Va. 522, 523, 28 S.E. 879, 879 (1898)); accord Moore Lumber Corp. v. Walker, 110 Va. 775, 778-79, 67 S.E. 374, 375 (1910); Virginia & Tennessee Coal & Iron Co. v. Fields, 94 Va. 102, 113, 26 S.E. 426, 427 (1896). We have since applied this waiver rule on numerous occasions.

In Southern Ry. Co. v. Hansbrough, 107 Va. 733, 60 S.E. 58 (1908), the plaintiff, whose intestate decedent was struck and killed by a passing train as he crossed a railway track, introduced evidence to show obstructions at the railway crossing where the accident occurred, which hindered the decedent's ability to hear or see the approaching train. Id. at 736-37, 60 S.E. at 60. The defendant railway company objected to the evidence, but the trial court allowed its introduction. Id. at 737, 60 S.E. at 60. Citing Taliaferro and Blandford, this Court found that the railway company had waived its objection to the admission of the evidence because the company had introduced evidence as to the surroundings at the railway crossing, as well as photographs, to show the obstructions in question. Id. Likewise, in Snarr v. Commonwealth, 131 Va. 814, 818, 109 S.E. 590, 592 (1921), the defendant

11

challenged the admission of evidence about the charge of reckless driving on the basis that such evidence was irrelevant to his arrest for unlawful transportation of intoxicating liquor. This Court held that the defendant had waived his objection to the Commonwealth's evidence because the defendant, himself, had recounted the events that had preceded his arrest, thereby also introducing evidence of the reckless driving charge. Id.

More recently, we have applied the waiver rule in Combs and Hubbard v. Commonwealth, 243 Va. 1, 413 S.E.2d 875 (1992). In Combs, we held that the plaintiff had waived his complaint that the use of certain exhibits as demonstrative evidence was reversible error because he had used the same exhibits in presenting his own demonstrative evidence. 256 Va. at 499, 507 S.E.2d at 360. The defendant in Hubbard asserted that the trial court erred in allowing the Commonwealth to introduce expert opinion evidence about the speed at which the defendant's vehicle was traveling. 243 Va. at 9, 413 S.E.2d at 879. We did not reach the merits of the defendant's claim because the defendant had also introduced opinion evidence concerning his speed. Id. We held that a "substantive rule of law . . . render[ed] irreversible the action of the trial court in permitting the Commonwealth to introduce reconstructed

12

opinion evidence of speed": " 'where an accused unsuccessfully objects to evidence which he considers improper and then on his own behalf introduces evidence of the same character, he thereby waives his objection.' " Id. (quoting Saunders v. Commonwealth, 211 Va. 399, 401, 177 S.E.2d 637, 638 (1970)).

There are, however, some limitations on the operation of the waiver rule. For instance, when the objecting party elicits evidence of the same character either during cross-examination of a witness or in rebuttal testimony, a duly made objection is not waived:

> We have never held that the mere cross-examination of a witness or the introduction of rebuttal evidence, either or both, will constitute a waiver of an exception to testimony which has been duly taken. To constitute such a waiver the party objecting to the evidence must have gone further and introduced on his own behalf testimony similar to that to which the objection applies.

Snead v. Commonwealth, 138 Va. 787, 801-02, 121 S.E. 82, 86 (1924); Culbertson v. Commonwealth, 137 Va. 752, 757, 119 S.E. 87, 88 (1923); see Brooks v. Bankson, 248 Va. 197, 207, 445 S.E.2d 473, 478-79 (1994) (plaintiff-sellers did not waive objection to trial court's admission of evidence concerning the buyers' "walk through" inspection of a house prior to closing when, in rebuttal, sellers introduced similar evidence about the house's condition); but see

13

Hoier v. Noel, 199 Va. 151, 155, 98 S.E.2d 673, 676 (1957) (plaintiff waived objection by introducing evidence about the manner in which the defendant drove in rebuttal to the defendant's evidence that he customarily drove in a careful manner).

Use of the waiver rule is also limited by the requirement that the subject matter of the evidence at issue be the same as the subject matter of the evidence to which an objection was made. In Pettus v. Gottfried, 269 Va. ___, ___ S.E.2d ___ (2004) (decided this day), we refused "to enlarge the rule's scope to apply this waiver principle to any purported violation of the same rule of evidence . . . when the subject matter of the testimony or exhibit at issue is not the same." Id. at ___, ___ S.E.2d at ___. The wavier rule "focuses on the [objecting] party's introduction of evidence on the same subject and was never intended to create a waiver permitting the consideration of inadmissible evidence on a different subject." Id. at ___, ___ S.E.2d at ___.

In the present case, Drinkard-Nuckols moved the circuit court to preclude the admission of any "expectation evidence" tending to show that health care providers other than the defendants were negligent. However, Drinkard-Nuckols elicited such evidence in her case-in-chief. She

14

asked Dr. Ford, as a radiologist, about his expectation concerning who would read his report of Drinkard's chest x-ray. In response, Dr. Ford testified that he expected some physician in the outpatient surgery department, meaning either Dr. Andrews, a defendant, or the anesthesiologist, who was not a defendant in this action, would read the report. Dr. Ford also stated that he was sure that the emergency room doctor would read the report and the "wet read." The emergency room doctor, Dr. Wynnyk, was no longer a defendant at the time of trial. Thus, Drinkard-Nuckols presented testimony on the same subject as that to which she had objected, i.e., "expectation evidence" tending to show that physicians who were not defendants in this action were negligent. And, she did so, not in cross-examining a witness or in rebuttal to the defendants' evidence, but in her own case-in-chief.

Nevertheless, Drinkard-Nuckols argues that the issue she raises on appeal was properly preserved and thus not waived because, pursuant to Code § 8.01-384(A), she was not required to renew her objection to the introduction of "expectation evidence" after the circuit court denied her motion in limine to exclude that evidence. While the provisions of Code § 8.01-384(A) obviate the need for repeated objections after having made an objection or

15

motion known to the trial court, that statute does not alter the waiver rule at issue here. Drinkard-Nuckols also asserts that, since the parties knew the circuit court was going to admit "expectation evidence," she was not required to avoid introducing such evidence while the defendants were free to do so. In making this argument, Drinkard-Nuckols, however, ignores the fact that, under the waiver rule, she was not precluded from introducing "expectation evidence" in rebuttal to such evidence presented by the defendants. See Brooks, 248 Va. at 207, 445 S.E.2d at 478-79. Instead, she opted to introduce "expectation evidence" in her case-in-chief.

Therefore, we conclude that Drinkard-Nuckols waived her objection to the introduction of "expectation evidence" not only by Dr. Ford but also by the other defendants. Even if such evidence was inadmissible, a question we do not decide, "it furnishes no ground for reversal." Snarr, 131 Va. at 818, 109 S.E. at 592. Accordingly, we will affirm the judgment of the circuit court.[6]

Affirmed.

---

[6] In light of our decision, we do not reach the cross-error assigned by Dr. Andrews and Piedmont Orthopaedics.

16