COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Fitzpatrick, Judges Felton and Kelsey
Argued at Chesapeake, Virginia


HAKIM M. ABDUL-WASI

                                                    MEMORANDUM OPINION* BY
v.        Record No. 2901-03-1              CHIEF JUDGE JOHANNA L. FITZPATRICK
                                                          MAY 3, 2005

COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
                            Christopher W. Hutton, Judge

            Terry N. Grinnalds for appellant.

            Robert H. Anderson, III, Senior Assistant Attorney General
            (Jerry W. Kilgore, Attorney General, on brief), for appellee.


        Hakim M. Abdul-Wasi (appellant) was indicted for first-degree murder in violation of

Code § 18.2-32.  He was convicted in a jury trial of voluntary manslaughter, and sentenced to

nine years in prison.  Appellant contends that the trial court erred in denying his motion to

suppress the transcript of his confession elicited by police officers on September 23, 2002.  He

argues that he was in custody for purposes of Miranda during the interrogation and the police

officers' failure to advise him of his rights required the statements to be suppressed.  Because we

hold any error under the facts of this case was harmless, we affirm.

                                   I.  BACKGROUND

        Under familiar principles of appellate review, we examine the evidence in the light most

favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible

therefrom.  See Juares v. Commonwealth, 26 Va. App. 154, 156, 493 S.E.2d 677, 678 (1997).

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

"In so doing, we must discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom." Watkins v. Commonwealth, 26 Va. App. 335, 348, 494 S.E.2d 859, 866 (1998).

Viewed in this light, the evidence established that at the time of the offense, appellant was suspicious that his wife Vernae Hill (Hill) had recently been romantically involved with Corey Wells (Wells). Based on this suspicion, on September 22, 2002 appellant drove his wife's car to Wells' home and encountered Hill and Wells outside the home. When appellant confronted Hill, she got into the rental car she was driving and pulled away. Appellant followed her to a nearby parking lot, pulled in beside her, and they argued for a few minutes before appellant left for work.

When appellant returned home, Hill admitted having sex with Wells and they began a heated argument. Appellant called her derogatory names, and a fight ensued. He stated that during the struggle he placed a choke hold on her and they fell to the ground. He saw that she was unconscious, and put her in the car to take her to the hospital. On the way to the hospital, appellant "realized that she wasn't coming back . . . [a]t that point I was just thinking what am I going to do? What have I done?" He eventually abandoned Hill's body and the car on a side street. As appellant approached his home on foot, the police confronted him and told him they had a warrant for his arrest for the unauthorized use of Hill's car, which she had reported stolen. They arrested him, took him to the police station, but released him after about forty-five minutes.

The next day, Hampton Police Officer Michael Vandenheade (Vandenheade) was dispatched to the rental car that contained Hill's body. He determined that Hill was dead and secured the area. He then went to appellant's home and placed him under "investigative detention" in handcuffs in the back of his police car. Officer Kimberly Brighton (Brighton)

arrived at appellant's home about an hour later. Brighton "asked him if he wouldn't mind coming down to the police department to speak to [her] on a consensual basis so [they] could determine the whereabouts of Ms. Hill." Appellant agreed to do so. Brighton then asked Vandenheade to remove appellant's handcuffs, and told appellant that she would give him a ride home after the interview concluded.

Appellant arrived at the police station with Brighton at approximately 8:00 or 9:00 a.m. on September 23. Officer Steven Hatfield (Hatfield) began to question appellant around 4:15 p.m. Appellant was asleep in the room when Hatfield arrived. During the initial period of questioning, Hatfield interrogated appellant intermittently over a period of over six hours. The transcript reveals that Hatfield began the interrogation as follows:

| | |
|---|---|
| Det. S. Hatfield: | Hakim. Okay, Hakim I appreciate you coming down here voluntarily. You're here on your own? |
| Hakim M. Abdul-Wasi: | Yes. |
| Det. S. Hatfield: | Okay. You realize you're not under arrest, you're free to go, et cetera. |
| Hakim M. Abdul-Wasi: | Yes. |

During the interrogation, Hatfield and other detectives attempted to elicit a confession from appellant, at first stating: "I think you know where she's at," and "Was there anything else that happened in Norfolk that I need to know about?" Initially, appellant was unresponsive to these questions.

Approximately one hour into the interrogation, detectives stated "Once again, we just want to check with you Hakim. You're still here on your own freewill, you understand, um?" to which appellant responded "Yeah." Detectives appealed to appellant's religious beliefs, stating "I mean you're a Christian, right?" . . . "You know, it's very obvious right now . . . that you're

hiding something . . . you don't need to carry a burden around." Detectives asked him to confess, stating that it was the right thing to do for "the Lord" and appellant's family.

Further into the questioning, Hatfield stated "right now you can't go on any further without letting the truth come out," to which appellant replied "Are you, are you saying that I'm under arrest?" Hatfield responded that he wasn't. Hatfield continued: "You're just about there to freedom, to be released from this." Appellant replied: "No, what's weighing on me is that you've got me here, um, you all . . . under the impression . . . I'm not being completely truthful . . . when in fact that's not the case." Minutes later, appellant stated "I would really like to check on my children, to see them," to which Hatfield responded "You'll have that – you'll have that opportunity . . . but right now we need to help you out before you can help you're [sic] children and check on them. . . ."

Despite the detectives' assurances that he was free to leave, appellant asked whether or not he had been charged or whether he was under arrest:

| Hakim M. Abdul-Wasi: | You all have already charged me. |
|---|---|
| Det. S. Hatfield: | No, we haven't. We have not. You're not under arrest, but you have the opportunity Hakim to tell us the truth, to tell us that it was an accident. We have not charged you. |
| Hakim M. Abdul-Wasi: | Then why am I being questioned about what – what happened to her? |

Near the end of the interrogation, appellant stated "I choose not to discuss anymore matters at this point," to which Hatfield responded "Uhh. We told you, you know, you're down here voluntarily – you're not under arrest. You're free to go. We want your help. We want you to do what's right, to help you out. Okay?" Appellant replied, "I want to see my children." Appellant asked, "Why can't I leave?" to which Hatfield responded, "All we're doing is asking you to do what's right. We appreciate you coming down here voluntarily." The detectives

- 4 -

repeatedly asked appellant to continue, and he responded that he couldn't "go on." At one point appellant asked: "If I say nothing else can I be able to leave?" Hatfield responded, "I told you you're not under arrest, okay?" A few minutes later appellant asked "If I choose not to say anything else until the morning would I be able to leave here tonight?" The questioning continued in this manner, with appellant repeatedly asking "Can I please leave," "I'm tired detective," "I'd just like to leave," "I'd like to go," and detectives pleading for him to do "What's right," stating "we got to finish tonight man." Eventually, at the end of the pre-Miranda questioning, the officers elicited an incriminating statement:

| | |
|---|---|
| Lt. R. Seals: | Okay. Well, you've already said it, your arms are around her neck, so what happens next? |
| Det. S. Hatfield: | You're on the floor your arms around her neck, you're tangled up. You said you couldn't get up. |
| Hakim M. Abdul-Wasi: | And I tried to get up; and she was tangled . . . struggling, struggling. . . |
| Lt. R. Seals: | How did you get into the car? |
| Hakim M. Abdul-Wasi: | Carried her. |
| Det. S. Hatfield: | Carried her? |

At that point, the officers took a break, then placed appellant under arrest, read him his Miranda rights, and resumed questioning. The ensuing interrogation produced a confession from appellant.

On January 6, 2003, appellant was indicted for murder in violation of Code § 18.2-32. On January 31, 2003, he moved to suppress the statements he made during questioning by Hampton police officers and detectives on September 23, 2002, because the interrogation was conducted while he was in custody without being advised of his Miranda rights. The trial court denied the motion and admitted the statements. During appellant's case-in-chief, he testified and

presented the same evidence he sought suppressed at trial. This included, *inter alia*, that he and Hill argued about her infidelity, that they struggled, that he placed a choke hold on her, that she lost consciousness and died, and that he placed her body in the car, drove away, and abandoned her and the car on a side street. During cross-examination by the Commonwealth, he admitted he killed his wife:

> Q: Because at that point, you knew your wife was dead?
>
> A: I knew that my wife was dead, yes.
>
> Q: Because you had, in fact, taken her life, is that correct?
>
> A: That is correct.

Appellant was convicted of voluntary manslaughter on July 11, 2003, and sentenced to nine years in prison on October 21, 2003. He filed his notice of appeal on November 10, 2003.

## II. ANALYSIS

Appellant contends on appeal that the trial court erred in denying his motion to suppress both the initial and post-<u>Miranda</u> confessions because: 1) he was in custody during the initial interrogation and was not given <u>Miranda</u> warnings, and 2) his later statement, given after he was placed under arrest and given <u>Miranda</u> warnings, was a product of the coercion of the pre-<u>Miranda</u> interrogation.

Assuming, without deciding, that the trial court erred in denying appellant's motion to suppress the interrogation transcript, we conclude that appellant's testimony at trial waived his right to object to the same evidence on appeal, rendering any error harmless. Thus, we affirm.

"Where an accused unsuccessfully objects to evidence which he considers improper and then on his own behalf introduces testimony of the same character, he thereby waives his objection, and we cannot reverse for the alleged error." <u>Hubbard v. Commonwealth</u>, 243 Va. 1,

9, 413 S.E.2d 875, 879 (1992); see also Bynum v. Commonwealth, 28 Va. App. 451, 459, 506 S.E.2d 30, 34 (1998).

At the suppression hearing, appellant objected to the Commonwealth's introduction of the interrogation transcripts, which contained his explanation of how his wife died. Later, during his case-in-chief, appellant testified to the same matters that were the subject of the earlier suppression hearing. On direct examination, he described the deterioration of his marriage, his suspicions that his wife was having an affair, his confrontation with his wife at Wells' home, their argument later that night, the ensuing struggle, his choking his wife which resulted in her death, and that he put her body in a car and later abandoned it. It was uncontroverted that appellant killed his wife. He admitted it in both his statement and in his testimony at trial. In both, he attempted to mitigate his culpability. We note, in fact, that his tactical decision to explain his actions effectively reduced his offense from murder to manslaughter. By presenting this evidence during his case-in-chief, he waived his objection to the evidence at the earlier suppression hearing. Thus, we cannot reverse for any alleged error.

We note that there are limitations on this waiver rule. When "the objecting party elicits evidence of the same character either during cross-examination of a witness or in rebuttal testimony, a duly made objection is not waived." Drinkard-Nuckols v. Andrews, 269 Va. 93, 102, 606 S.E.2d 813, 818 (2005). This limitation is inapplicable in the instant case. As we have stated, during his case-in-chief appellant testified at length concerning evidence of the same character as that to which he objected at the suppression hearing. Appellant was the sole witness presented, and his testimony was sufficiently similar to his testimony during the interrogation to waive his objection to the same evidence at the suppression hearing.

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.