COURT OF APPEALS OF VIRGINIA

Present:   Judges Malveaux, Chaney and White
Argued at Lexington, Virginia

JAMEL DUQUON FLINT

v.        Record No. 0656-24-3

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE MARY BENNETT MALVEAUX
JULY 29, 2025

FROM THE CIRCUIT COURT OF MONTGOMERY COUNTY
Robert M.D. Turk, Judge

John S. Koehler (The Law Office of James Steele, PLLC, on brief),
for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.

A jury convicted Jamel Duquon Flint ("appellant") of first-degree murder, in violation of

Code § 18.2-32, two counts of aggravated malicious wounding, in violation of Code § 18.2-51.2(A),

and three counts of use of a firearm in the commission of a felony, in violation of Code § 18.2-53.1.

On appeal, appellant contends that the trial court erred by overruling his motion *in limine* and

allowing the admission of videos and a photograph retrieved from his cell phone.  Finding no error

by the trial court, we affirm its judgment and remand for the limited purpose of correcting a

scrivener's error.

I.  BACKGROUND

"On appeal, 'we review the evidence in the "light most favorable" to the Commonwealth,'

the prevailing party below."  *Diaz v. Commonwealth*, 80 Va. App. 286, 295 (2024) (quoting

*Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc)).  This principle "requires us to

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom.'" *Id.* (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 254 (2003) (en banc)).

On the night of February 4, 2022, appellant and his friend, Jalen Pierce, traveled to Radford from Roanoke. There, they met a group of young women at a convenience store and attempted to enter fraternity parties at Radford University. Denied admission, they returned to the store, where surveillance cameras recorded appellant wearing a puffy black coat. While in the store, appellant saw a man he knew as "Shakee." Appellant believed Shakee had been involved in a shooting several months earlier in which appellant was wounded.

Appellant, Pierce, and some friends then drove to Melody Hookah Lounge in Blacksburg. The women from the convenience store drove separately and joined the men. Surveillance footage from cameras in the lounge depicted both appellant and Shakee there that evening. Appellant testified that he saw Shakee in the lounge but did not see him with a firearm.

Appellant went outside to get his wallet from the car. Returning, he had to wait in line to reenter the lounge. While in line outside, appellant saw Khari Brice, whom he recognized. Suddenly, appellant fired a gun in Brice's direction. He then fled with Pierce. The gunfire killed a high school student who was at the lounge. Additionally, a college student and Brice were seriously injured. A forensic detective later collected spent bullets from the front of the lounge and 13 bullet casings from outside the lounge.

Detective Ryan Hite interviewed appellant on February 5, 2022. Appellant told Hite he had been shot the previous November and spent a month in the hospital recovering. He also said he knew who shot him, but he would not identify the shooter. Appellant admitted that he had travelled to Radford and met women at the convenience store, and he identified himself and Pierce on the convenience store surveillance footage. He stated that while he was in the store, he saw a man he

knew from Roanoke and with whom he had a conflict. Initially, appellant denied travelling on to Blacksburg, but he later admitted that he went to the lounge there and thought it was "weird" when he saw people there whom he knew from Roanoke. Appellant admitted that he had left the lounge and then returned, but denied that he was involved in the shooting. He told police that he fled when the gunfire began.

The following day, in a second police interview, appellant stated that he felt it was "weird" to see Shakee both in the Radford convenience store and the Blacksburg hookah lounge. Because Shakee was someone he had a "beef with" in the Roanoke area, appellant thought he "was set up." He also stated that the people in front of him in the line outside the lounge were joking about him having been shot. Hite testified that although appellant "never overtly said that he was the person shooting" outside the lounge, appellant did state that "it's all fun and games when the tables are turned." Appellant also commented, "I didn't mean to take that man's life." Appellant told Hite it had been two or three months since he had handled a firearm.

Before trial, appellant filed a motion *in limine* to prevent the Commonwealth from introducing videos and photographs recovered from his cell phone. The videos showed appellant with or near a firearm of the same type that the Commonwealth argued had been used in the shooting, and a photograph showed appellant wearing "a black puffer coat and a beanie." Appellant contended that because he had identified himself in the surveillance footage during his police interview, photographs of him wearing clothing that matched witness descriptions of the shooter's clothing lacked relevance. He further argued that the videos depicting him with firearms were more prejudicial than probative. Appellant asserted that the challenged evidence was intended to depict him as "some gun-toting thug" and should be excluded.

The Commonwealth argued that forensic examination of the casings and bullet fragments recovered from the lounge had determined that they were consistent with having been fired by a

9-millimeter weapon, likely a Glock or a Smith and Wesson Luger. The firearms depicted with appellant in the videos were Glock 9-millimeter weapons, the same type and caliber of firearm used in the shooting, and the videos had been saved to appellant's phone just 11 days before the shooting. Images of appellant wearing the same type of clothing witnesses described the shooter wearing were uploaded two months before the shooting. The Commonwealth asserted that even though appellant had admitted that he was the person in the surveillance videos, the Commonwealth was not prohibited from introducing other relevant evidence tending to prove that appellant was the gunman. The trial court took the matter under advisement and later denied appellant's motion, finding that the probative value of the evidence outweighed any prejudicial effect.

At trial, witnesses described the shooter as dressed in all black and wearing a black face covering. One witness saw the shooter wearing dark clothing, including a "puffer jacket." The jury viewed the video surveillance footage from the lounge. The Commonwealth also introduced the videos recovered from appellant's cell phone that depicted him handling two firearms, as well as a photograph from the cell phone that depicted appellant wearing a black puffer jacket.

After the Commonwealth presented its case in chief, appellant moved to strike the evidence. Challenging appellant's identity as the shooter, counsel for appellant argued, "[w]e don't believe that they've proven a prima faci[e] case that my client committed these crimes." The trial court denied the motion.

Appellant testified on his own behalf. He acknowledged travelling to Radford and visiting the convenience store. When shown still photographs excerpted from the store's video surveillance footage, he acknowledged that he was depicted in the photographs. Describing his subsequent visit to the lounge, appellant said that after he left to get money from his car and then returned to the lounge, he saw Brice, who turned and spoke with him. Appellant stated that he then saw Brice "try to pull a gun out of his waistband." Asked by defense counsel "what went through [his] head" at

the sight of Brice with a firearm, appellant replied that he was "scared" because he had "just com[e] from being shot" and did not "know what [Brice] planned on doing." Appellant, however, was not "about to wait and see." Questioned further by his attorney, this exchange followed:

> DEFENSE COUNSEL: When you saw [Brice] pull the firearm from his waistband, were you in fear for your life --
>
> APPELLANT: Yeah.
>
> DEFENSE COUNSEL: -- after you saw what he was doing?
>
> APPELLANT: Mhmm.
>
> DEFENSE COUNSEL: Do you remember approximately how many shots were fired?
>
> APPELLANT: I believe like 7 to 8.
>
> DEFENSE COUNSEL: Do you know if [Brice] got any shots off?
>
> APPELLANT: I mean it happened so fast to be honest. I don't know it could have been a possibility, I don't know.

Appellant's attorney also asked whether appellant had been "shooting at anyone other than [Brice] that night," to which appellant responded negatively. And when asked if the "shots that [he] fired were in [Brice's] direction," appellant replied affirmatively. Following the shooting, appellant ran to his car and he and Pierce fled the scene.

On cross-examination, appellant agreed that he thought that Brice and Shakee were responsible for shooting him several months earlier. He acknowledged that he possessed a 9–millimeter Glock at the lounge and admitted lying to the police when he told them that he had not handled a gun for two to three months prior to the shooting. Appellant further acknowledged that he fired the weapon, responding, "I don't believe so," when asked whether he had "emptied [his] gun" when he fired. He also agreed that he "kept shooting" after he saw Brice attempt to flee.

- 5 -

The jury convicted appellant of first-degree murder, two counts of aggravated malicious wounding, and three counts of use of a firearm in the commission of a felony. This appeal followed.

## II. ANALYSIS

Appellant argues that the trial court abused its discretion by admitting the cell phone videos that depicted him displaying firearms and the cell phone photograph depicting him wearing a knit cap, facemask, and "black puffer coat." He contends that this evidence "depicted [him] in a highly prejudicial light and [was] neither probative of any element of the offenses charged nor offered to rebut any defense."

"The admissibility of photographic and video evidence rests within the sound discretion of the trial court." *Baez v. Commonwealth*, ___ Va. ___, ___ (Dec. 19, 2024). Thus, when reviewing a trial court's decision to admit or exclude such evidence, "we apply an abuse of discretion standard." *Bista v. Commonwealth*, ___ Va. ___, ___ (Nov. 14, 2024). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Diaz*, 80 Va. App. at 305 (quoting *Lambert v. Commonwealth*, 70 Va. App. 740, 749 (2019)).

We need not address appellant's argument that the trial court erred by admitting the cell phone videos and photograph at issue, because appellant has waived that argument. The Commonwealth introduced the videos and photograph to help establish appellant's identity as the shooter at the hookah lounge. *See Settle v. Commonwealth*, 55 Va. App. 212, 225 (2009) (noting that in any criminal prosecution, the Commonwealth must establish the defendant's identity as the perpetrator). Yet appellant himself introduced evidence demonstrating that he was in fact the shooter. Testifying on his own behalf, appellant stated that he saw Brice try to pull a firearm from his waistband and that this sight frightened him; appellant had recently been injured in a shooting for which he held Brice and another man responsible, and he did not know what Brice's

- 6 -

intentions were. Appellant further stated that he was not "about to wait and see" what Brice "planned on doing" or whether he "planned on using that gun." He acknowledged that he had been the shooter when he told defense counsel "7 to 8" shots were then fired but that he did not know whether Brice fired any of those shots before he fled the scene.

"The law in this area is well established. When 'an accused unsuccessfully objects to evidence which he considers improper and then on his own behalf introduces evidence of the same character, he thereby waives his objection, and [the appellate court] cannot reverse for the alleged error.'" *Stevens v. Commonwealth*, 72 Va. App. 546, 557 (2020) (alteration in original) (quoting *Hubbard v. Commonwealth*, 243 Va. 1, 9 (1992)). "[T]his concept provides that a party 'cannot . . . avail[]' himself of an objection to evidence if he 'has, at some other time during the trial,' either 'voluntarily elicited the same evidence' or 'permitted it to be brought out by [the opposing party] without objection.'" *Id.* (second, third, and fourth alterations in original) (quoting *Burns v. Bd. of Supervisors*, 227 Va. 354, 363 (1984)). "This legal maxim is sometimes called the 'same-evidence principle.'" *Id.* (quoting *Isaac v. Commonwealth*, 58 Va. App. 255, 260 (2011)). Here, appellant's tacit acknowledgement that he fired at Brice, allegedly in self-defense, provided exactly the same evidence that the Commonwealth presented by introducing the videos and photograph at issue—i.e., evidence that appellant was in fact the shooter. Because appellant introduced the same evidence as the Commonwealth on this point, he waived his previous objections to the Commonwealth's evidence. Accordingly, the trial court did not err as alleged by appellant.[1]

---

[1] The dissent takes issue with our application of the same-evidence principle in our holding that appellant waived his objection to admission of the images. Relying on a footnote in *Stevens*, the dissent contends that the principle "'should be narrowly construed' when it involves evidence that is merely of the same kind or character, such as a 'type of evidence' like hearsay or leading questions." *Infra* at 13 (quoting *Stevens*, 72 Va. App. at 557 n.4). The dissent implies from this selective quotation that the principle should not have been applied here. But reading

But although the trial court committed no substantive error, we note an omission in the

court's sentencing order that requires correction. At the sentencing hearing, the court sentenced

appellant to 20 years' incarceration for each of the two aggravated malicious wounding offenses,

in cases CR22001125 and CR22001126. The court's disposition notice indicated that 18 years

would be suspended in case CR22001125 and all 20 years would be suspended in case

CR22001126. And while the court's sentencing order reflects both 20-year sentences, it recites

only the suspension in case CR22001125 and omits any reference to a suspension in case

---

the entirety of the relevant passage from *Stevens*, as we must, demonstrates that the dissent's
reliance on the footnote is inapposite:

> This [same-evidence] principle applies to "exactly the same
> evidence" as well as three additional types of evidence. The first
> category is "evidence dealing 'with the same subject.'" The
> second type is "evidence fairly considered to be 'of the same
> character.'" The third kind encompasses "evidence 'similar to that
> to which the objection applies.'"

*Stevens*, 72 Va. App. at 557 (citations omitted). It is thus self-evident that the footnote's
language advocating narrow construal of the principle relates only to the "second type" of
evidence described by *Stevens*, i.e., "evidence fairly considered to be 'of the same character.'"
*Id.* (citation omitted); see also *id.* n.4 ("The same-evidence waiver principle 'should be narrowly
construed' when it involves evidence that is merely of the same kind or character, such as a 'type
of evidence' like hearsay or leading questions." (quoting Kent Sinclair, *The Law of Evidence in
Virginia* § 2-3[c], at 126 (8th ed. 2018))). Here, however, the evidence introduced by appellant
that waived his previous objection to the images' admission—his acknowledgement of his
identity as the shooter—was evidence of the first type described by *Stevens*, i.e., "evidence
'dealing with the same subject.'" *Id.* (citation omitted). Thus, the footnote language relied upon
by the dissent (which we note is mere dicta grounded in non-binding treatise authority) is
inapposite here.

The dissent compounds its error by relying on *Drinkard-Nuckols v. Andrews*, 269 Va. 93,
(2005), for the proposition that "[t]he waiver rule 'focuses on the [objecting] party's introduction
of evidence on the same subject and was never intended to create a waiver permitting the
consideration of inadmissible evidence on a different subject.'" *Id.* at 103 (second alteration in
original) (quoting *Pettus v. Gottfried*, 269 Va. 69, 79 (2004)). Based on this language, the
dissent maintains that appellant "did not waive any argument about the evidentiary value of the
video" when he "testified about his state of mind and admitted that he was the shooter." *Infra* at
13-14. But *Drinkard-Nuckols*, by its plain language, does not speak to the potential bases for
admission or exclusion of certain pieces of evidence; rather, it speaks only to whether those
pieces of evidence introduced at trial address the same subject, as they did here—the identity of
the shooter.

- 8 -

CR22001126.[2]  We therefore remand for the trial court to correct the sentencing order to clarify

appellant's sentence in case CR22001126.  *See* Code § 8.01-428(B) (authorizing trial courts to

correct "[c]lerical mistakes in all judgments or other parts of the record and errors therein arising

from oversight or from an inadvertent omission").

III.  CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment and remand for the limited

purpose of correcting a scrivener's error.

*Affirmed and remanded.*

---

[2] The sentencing order reflects a total sentence imposed of 103 years, which figure includes 20 years for each of the aggravated malicious wounding convictions.  It then states that the trial court was suspending 38 years of appellant's sentence, leaving 65 years to be served, and specifies how much time, if any, would be suspended for each offense.  But although this portion of the order specifies that appellant would serve "2 years on CR22001125[]," with 18 years thus suspended, and would serve full sentences for his first-degree murder and use of a firearm offenses, it makes no mention of case CR22001126.  The 20-year sentence in case CR22001126, if suspended in full as suggested by the court's disposition notice, would supply the remaining suspended time to total the 38 years ordered by the court.

Chaney, J., dissenting.

I disagree with the majority's holding that Flint waived his argument on appeal. I would find that the admission of Exhibits 31A, 32, and 33—the video and associated screen capture images—was error. Therefore, I respectfully dissent.

## I. Background[3]

### A. *Flint fired several rounds in a confrontation outside of Melody Hookah Lounge in Radford.*

In February 2022, Flint and Jalen Pierce traveled to Radford University, where they were denied entry to a fraternity party. They then went to a convenience store, where Flint saw a man he knew as "Shakee," whom Flint believed was responsible for gunshot wounds he had suffered in Roanoke months earlier. The convenience store's surveillance camera showed Flint wearing a puffy black coat.

Flint, Pierce, and two other men drove to Melody Hookah Lounge in Blacksburg. Flint first entered the lounge but then left briefly to retrieve his wallet from the car. Flint returned to the lounge, but had to wait outside in line to get back in. There he saw Khari Brice, whom he recognized from and also believed was responsible for his shooting in Roanoke along with "Shakee." Flint had a handgun and opened fire in Brice's direction. He fled the scene with Pierce.

---

[3] "We recite the facts 'in the "light most favorable" to the Commonwealth, the prevailing party in the trial court.'" *Pereira v. Commonwealth*, 83 Va. App. 431, 439 n.3 (2025) (quoting *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)). In doing so, we discard the proposed evidence of the accused and grant the Commonwealth any fair inferences from the evidence established at trial. *Id.* at 454. However, we do not grant the Commonwealth inferences that extend into the realm of the non sequitur. *See Commonwealth v. Wilkerson*, ___ Va. ___, ___ (Feb. 20, 2025) ("Reasonable inferences drawn by the factfinder 'cannot be upended on appeal unless we deem them so attenuated that they push into the realm of *non sequitur.*'" (quoting *Commonwealth v. Perkins*, 295 Va. 323, 332 (2018))).

- 10 -

The gunfire killed Isiah Robinson, who was in line with Brice at the lounge celebrating his acceptance into college. It also wounded Shamar Mansion—a stranger to those involved in the altercation. Likewise, it wounded Brice. Flint was charged in connection with the shooting.

B. *Flint's interviews with Detective Hite*

Following the shooting, Flint had two interviews with Detective Ryan Hite of the Blacksburg Police Department. In those interviews, Flint told Hite that he had been the victim of gun violence in Roanoke a few months earlier. Flint indicated that he knew who the perpetrators were but would not name them.

Flint recounted to Detective Hite how he had traveled to Radford from Roanoke. Detective Hite showed Flint a couple photographs from surveillance footage taken from the Radford 7-Eleven, and Flint identified himself in one of those photographs. Flint told Hite that he had recognized another individual in the 7-Eleven as someone from Roanoke "and knew him to be someone that he had some conflict or had some beef with."

Flint did not admit to Hite that he had been in Blacksburg the night of the shooting, but later acknowledged that he was at Melody Lounge that night. "He would never overtly tell us that he was shooting or he was involved in the shooting, he just said that that's when the shooting took place and that he fled the area when the shots started."

In the second interview, Flint told Hite that he recognized a group at Melody Lounge as being the folks responsible for his being shot in Roanoke. Flint commented that he felt like he was being set up. Of the victims of the shooting, Flint told Hite, "I feel like everybody deserved it. . . . [I]t's not so funny when the tables are turned," and finally, "I didn't mean to take that man's life."

C. *Flint moves pretrial to exclude videographic and photographic evidence.*

Flint moved *in limine* to suppress (1) "several clips of Mr. Flint dressed in a black puffer coat and a beanie while in possession of what appears to be a firearm and also photographs" and (2) videographic "evidence of Jamel Flint flashing a firearm while freestyling rap lyrics in a TikTok Video." Exhibit 30 depicts Flint in a black "puffer" coat while wearing a facemask. Exhibit 31A is a video of Flint with strobing lights, brandishing two firearms, and pretending to shoot at the camera.

Flint argued that this evidence painted him as a "gun-toting thug." The Commonwealth responded that the photos were useful to prove Flint's access to firearms, as well as his identity because the photos taken from the cell phone would show Flint's wearing similar clothing to that of the suspected shooter in the 7-Eleven surveillance footage. The Commonwealth noted:

> I mean many people post pictures of themselves with firearms, there's nothing wrong with that. If the case did not involve a firearm, then perhaps that photo would somehow be prejudicial but . . . the photo could be irrelevant but that's . . . that's not the case here. Clearly firearms are a part of this case.

The Commonwealth agreed that it would mute the video played at trial. Flint again urged that his portrayal near or displaying a firearm would be unduly prejudicial because he was charged with murder, attempted murder, aggravated malicious wounding, and the use of a firearm. The circuit court took Flint's motion under advisement and allowed the admission of the photos and video, saying in a written ruling "that the evidence is more probative than prejudicial."

D. *Flint is convicted at a jury trial.*

A two-day jury trial began on September 11, 2023. Detective Hite testified about his interviews with Flint. For the first time, Hite told the finder of fact that Flint told him that he had not "handled or fired a firearm" for two or three months before the trial and "I don't even play

- 12 -

with weapons." Forensic examiners testified about ammunition and ballistics that they retrieved in front of Melody Lounge.

The Commonwealth admitted screen captures from the Radford 7-Eleven and the cell phone photos depicting Flint in a black "puffer" jacket. It also introduced surveillance video from Melody Lounge. Witnesses described the shooter as wearing all black, including a face covering. One witness testified seeing the shooter wearing dark clothing, including a "puffer jacket."

Flint testified in his own defense. He said that he encountered Brice in line to get back into Melody Lounge. Flint stated that Brice pulled a gun from his waistband and, fearing for his life, Flint fired his weapon multiple times. Flint acknowledged that he thought Brice was responsible for shooting him months earlier and that the gun he used at the lounge was a 9-millimeter Glock. Flint testified that he had been in fear for his life.

## II. Flint did not waive his assignment of error.

The majority relies on *Stevens v. Commonwealth*, 72 Va. App. 546, 557 (2020), for the proposition that Flint lost his ability to challenge the admission of the videos because he "voluntarily elicited the same evidence." S*upra* at 7. This reliance is misplaced. *Stevens* goes on to say that the "same-evidence waiver principle 'should be narrowly construed' when it involves evidence that is merely of the same kind or character, such as a 'type of evidence' like hearsay or leading questions." *Stevens*, 72 Va. App. at 557 n.4. There "is no exception to this principle 'when the defendant presents in his case in chief the same or similar evidence he previously object[ed] to in order to explain it away or to offer a more favorable interpretation." *Id.* (quoting *Isaac v. Commonwealth*, 58 Va. App. 255, 262 (2011)).

Here, Flint testified about his state of mind and admitted that he was the shooter. Whereas at the hearing on his motion *in limine*, Flint objected to the video's introduction because

of its irrelevance and prejudicial effect. "The waiver rule 'focuses on the [objecting] party's introduction of evidence on the same subject and was never intended to create a waiver permitting the consideration of inadmissible evidence on a different subject.'" *Drinkard-Nuckols v. Andrews*, 269 Va. 93, 103 (2005) (alteration in original) (quoting *Pettus v. Gottfried*, 269 Va. 69, 79-80 (2004)). By testifying about his participation in the shooting, Flint did not waive any argument about the evidentiary value of the video.

### III. Admitting the video and associated screen captures as Commonwealth Exhibits 31A, 32, and 33 was an abuse of discretion.

#### A. *Standard of Review*

We "review a trial court's decision to admit or exclude evidence using an abuse of discretion standard." *Kenner v. Commonwealth*, 299 Va. 414, 423 (2021). The trial court necessarily abuses its discretion when it makes an error of law. *See Pereira v. Commonwealth*, 83 Va. App. 431, 445 (2025). "Evidence relating to a point properly at issue in a case is relevant and, therefore, admissible if it has 'any logical tendency, however slight,' to establish that point." *Church v. Commonwealth*, 71 Va. App. 107, 123 (2019) (quoting *Ragland v. Commonwealth*, 16 Va. App. 913, 918 (1993)). However, even evidence deemed relevant "must be excluded if its probative value is 'outweighed by other, negative factors.'" *Byrd v. Commonwealth*, 30 Va. App. 371, 376 (1999) (quoting Charles E. Friend, *The Law of Evidence in Virginia* § 11-3 (4th ed. 1993)). The issue is whether "the probative value of the evidence is substantially outweighed" by "the danger of unfair prejudice." Va. R. Evid. 2:403.

I assume that the trial court did not err by admitting the photograph marked as Commonwealth's Exhibit 30.[4] Even so, the trial court *did* err by admitting the video and related screen captures.

---

[4] This Court "strive[s] to decide cases on the 'best and narrowest grounds available.'" *Carter v. Commonwealth*, 79 Va. App. 329, 349 n.9 (2023) (quoting *Alexandria Redev. & Hous.*

B. *The video Exhibit 31A and associated screen captures in Exhibits 32 and 33 were at most minimally probative, and that probative value was substantially outweighed by the danger of undue prejudice.*

The Commonwealth chiefly argues that the video was admissible because it helped establish Flint's identity. The Commonwealth points to no authority stating this. Without caselaw to back it up, the proposition seems to require an inferential leap that cannot be sustained by logic.

The video and associated screen captures showed Flint brandishing two guns and pretending to shoot the camera while a colored flame effect strobed around him. This is not probative of Flint's identity—Detective Hite testified that the brown gun was *ruled out* as the murder weapon, and his testimony that the second gun was the same "kind" as the shooting weapon was equivocal. Even if it is probative of Flint's access to a firearm, that access was not seriously at issue in this trial. Multiple witnesses in the Commonwealth's case-in-chief identified Flint as the shooter.

Assuming that the video *is* probative of identity, the Commonwealth itself admits that substantial other evidence established it: "In this case, other evidence introduced by the Commonwealth fully established that Flint was the shooter." A'ee Br. 23 (collecting citations to the record). The cumulative nature of the video as identity evidence diminishes its probative value. *Cf., e.g.*, *United States v. Carreon*, 242 Fed. App'x. 221, 226 (5th Cir. 2007) ("Where intent is well-established by independent evidence, prior convictions offered to show intent are

---

*Auth. v. Walker*, 290 Va. 150, 156 (2015)); *see also PDK Lab'ys, Inc. v. Drug Enf't Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring) ("This is a sufficient ground for deciding this case, and the cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more—counsels us to go no further.").

considered essentially cumulative evidence and their probative value is diminished accordingly.").[5]

Meanwhile, the danger of unfair prejudice posed by this video is substantial. A video with strobing lights in which Flint brandished two firearms and pretended to shoot them at the viewer unnecessarily portrayed him as malicious and hostile, playing on racial stereotypes that provoke a strong emotional reaction in the jury. *See Fields v. Commonwealth*, 73 Va. App. 652, 673 (2021) ("[T]he nature of the evidence must be such that it generates such a strong *emotional* response that it is unlikely that the jury could make a *rational* evaluation of its proper evidentiary weight.").

The Commonwealth also argues that the videos are probative to show that Flint misled Detective Hite when he said he had not "handled or fired" a firearm within two or three months of the shooting and that he did not "play" with firearms. The Commonwealth did not make this argument at the motion *in limine* hearing, and the record does not establish that the video was useful to impeach Flint. The right-result-wrong-reason doctrine does not apply:

> "[W]here a [lower] court's decision is correct, but its reasoning is incorrect, and the record supports the correct reason, we uphold the judgment pursuant to the right result for the wrong reason doctrine." However, [this] doctrine "does not apply unless the record on appeal fully supports the appellee's argument on appeal," and "it does not apply where the development of additional facts is necessary."

*Antle v. Commonwealth*, 83 Va. App. 485, 516 n.16 (2025) (second alteration in original) (first quoting *City of Charlottesville v. Sclafani*, 300 Va. 212, 222 (2021); and then quoting *Spinner v. Commonwealth*, 297 Va. 384, 391 (2019)). At trial, the Commonwealth argued that Flint had

---

[5] We find the holdings of our sister-state courts to provide useful examples for this discussion. *See Fagan v. Commonwealth*, 63 Va. App. 395, 398 (2014) (looking to "persuasive authority from our sister courts" for illustrations of parting with property "willingly" as opposed to by "force or threat").

lied to Detective Hite when he said that he had not handled firearms. However, Flint would later testify that, at the time, he thought he *had* been telling the truth. This conflict in testimony was not resolved by the finder of fact. Because this issue involves findings of fact that were not made at the trial court, we cannot apply the right-result-wrong-reason doctrine.

Finally, the Commonwealth argues that *Fields v. Commonwealth* is instructive. As far as this video and photos go, it is not. In *Fields*, this Court upheld the admission of photographic and social media evidence against a challenge to its prejudicial value. There, Fields was convicted of first-degree murder, malicious wounding, aggravated malicious wounding, and leaving the scene of an accident. *Fields*, 73 Va. App. at 660. Those charges arose from Fields driving into a crowd of counter-protestors during the "Unite the Right" rally in Charlottesville. *Id.* at 661. The objected-to evidence included (1) protest memes showing a car driving into a crowd of protesters, (2) an image of Hitler establishing Fields's connection with white supremacy, and (3) pretrial jail cell calls in which Fields commented on the process and the counter-protestors in Charlottesville. *Id.* 672-78.

This Court held that the disputed evidence went directly to Fields's motive and intent— which were at issue in the trial. The memes showed Fields's contempt for protestors. The picture of Hitler showed Fields's connection with White Supremacist groups, which in turn established Fields's hostility towards his victims. And the jail cell calls again went to Fields's motive for the attack. Conversely, here, Exhibit 31A and the associated photographs did not go to any matter at issue and produced a substantially prejudicial effect on the jury. Because their probative value was substantially outweighed by their posing a substantial danger of prejudicial effect, admitting Exhibits 31A, 32, and 33 was an abuse of discretion.

I cannot say with confidence that introducing this video did not affect the jury's verdict concerning Flint's intent. *See Wilkins v. Commonwealth*, 64 Va. App. 711, 732 (2015)

- 17 -

(Humphreys, J., dissenting). Because this error did not have "but slight effect" on the verdict, the verdict should not stand. *Bista v. Commonwealth*, 76 Va. App. 184, 229 (2022) (quoting *Lienau v. Commonwealth*, 69 Va. App. 254, 270 (2018)). I respectfully dissent.